IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


KATHLEEN A. BENZ,                        )
      Apartment 208                      )
      450 Massachusetts Avenue, N.W.     )
      Washington, DC 20001-6203,         )
                                         )
            Plaintiff,               )
                                         )
v.                                       )          Civil Action No. _____
                                         )
THE WASHINGTON NEWSPAPER                  )
 PUBLISHING COMPANY, LLC,                )
      6408 Edsall Road                   )
      Alexandria, Virginia 22312,        )
                                         )
      SERVE:                             )
                                         )
      C. T. CORPORATION SYSTEM,          )
      Suite 1000                         )
      1015 Fifteenth Street, N.W.        )
      Washington, DC 20005,              )
                                         )
And                                      )
                                         )
JOHN F. BISNEY,                          )
      5803 Ryland Drive                  )
      Bethesda, Maryland 20817-2538,     )
                                         )
            Defendants.              )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THE MOTION FOR TEMPORARY RESTRAINING ORDER
PURSUANT TO Fed. Rule Civ. Pro. 65(b) OF PLAINTIFF, KATHLEEN A. BENZ**

         Plaintiff, Kathleen A. Benz, is no public figure.  She is a young professional

woman, 35 years old, unmarried and living alone who works hard at her job as assistant story

editor and assistant producer at Cable News Network (hereinafter referred to as "CNN").  Ms.

Benz spurned the romantic and sexual importunings of her colleague at work, the 50-something year old John F. Bisney, one of the two defendants in this case, a man she had thought of as a friend. His desires thwarted, defendant John F. Bisney began a rampage of character assassination designed to destroy Ms. Benz's emotional and physical health, a rampage that continues to this minute.

In retaliation for turning him down, defendant John F. Bisney has (among other things) invaded Ms. Benz's electronic mail (hereinafter referred to as "e-mail") account and read her private e-mail messages; started Internet websites in her name (but without her knowledge or permission) where he posted personal information about Ms. Benz as well as photographs he had taken of her on vacation wearing only a bikini; sent e-mails in Ms. Benz's name to men seeking sex via the Internet giving Ms. Benz's work and home telephone numbers and addresses as well as her e-mail address, advising the men to call Ms. Benz at work and stating in explicit terms what sexual services Ms. Benz would perform for them; and set up phony Internet advertisements in Ms. Benz's name seeking sexual encounters. As a result of defendant John F. Bisney's activities, Ms. Benz has been inundated with telephone calls and e-mail messages from men whom she does not know who believe she seeks to have sex with them.

Defendant John F. Bisney—who fancies himself a radio journalist—also wrote a fake news article about a romance between Ms. Benz and a notorious producer of pornographic films, a man named Mark Kulkis. In this phony article, defendant John F. Bisney falsely accused Ms. Benz, in effect, of being a prostitute by stating that she used her job connections to obtain dates with wealthy and prominent men from whom she could then obtain money; said she had engaged in romances and sexual encounters with a long list of men, most of whom Ms.

Benz does not know or only knows professionally; characterized Ms. Benz as a "slut;" and generally attacked her character and attempted to destroy her reputation.  The main point of the article was that Ms. Benz was engaged in a romantic and sexual liaison with Kulkis, a person that Ms. Benz has met only briefly and then professionally, in connection with an interview that her employer assigned her to produce as part of her work responsibilities.  The article stated that even this "romance" with Kulkis was no more than a sham designed to advance Ms. Benz's career by enabling Ms. Benz to obtain information about a supposed lunch between Kulkis and Karl Rove, a White House advisor.

Defendant John F. Bisney spread this article all over the Internet, sending it to various sites that contain explicit sexual content as well as to sites that defendant John F. Bisney knows are read by colleagues of Ms. Benz.  As the Court reads this, this article is available at hundreds and hundreds of sites.  From time to time, defendant John F. Bisney has updated the article, adding names of more men that he claims Ms. Benz had sex with or sought money from and allegations of sluttish behavior and sexual disease.  Defendant John F. Bisney has e-mailed Ms. Benz and members of her family, directing them to various pornographic websites where the article appears.  Defendant John F. Bisney supplied a photograph of Ms. Benz to go with the fake news item.

Not content with all this, defendant John F. Bisney impersonated the head of a charitable foundation for which Ms. Benz performs volunteer work, Hoop Dreams, and in the name of that chair sent an e-mail to the members of the Hoop Dreams board of directors informing them of the article about Ms. Benz as though it were a newsworthy item they should all read.  Defendant John F. Bisney has impersonated various supervisory personnel at CNN and sent e-mail messages to Ms. Benz upbraiding her for her behavior in dating Kulkis, as

3

though the story were a true one.  He has fabricated a romantic and sexual liaison between Ms.

Benz and a Texas Congressman and sent another phony article about that supposed romance to

persons who run Internet sites that focus on Texas politics.

Defendant John F. Bisney has sunk to more such despicable behavior, as is

detailed below.  And he has done so knowing that Ms. Benz suffers from migraine headaches

and a form of epilepsy that causes her to have seizures, debilitating headaches, and extreme

nausea.  Defendant John F. Bisney knows as well that stress exacerbates these conditions.

Even so, he has attacked—and at this moment continues to attack—Ms. Benz in this craven

campaign to destroy her.

Ms. Benz has instituted this lawsuit to obtain money damages from defendant

John F. Bisney and from defendant The Washington Newspaper Publishing Company, LLC, an

entity that, without one thing to verify defendant John F. Bisney's slanderous allegations,

published defendant John F. Bisney's libels in a news sheet that it distributes free in the

Washington, D.C., area, as well as on the Web.  But the threat that money damages will be

awarded at the conclusion of this case cannot effectively stop defendant John F. Bisney's

continuing campaign of harassment and intimidation while this lawsuit progresses.  Ms. Benz

therefore has moved this Court for a Temporary Restraining Order and a Preliminary Injunction

enjoining defendant John F. Bisney from continuing to impersonate Ms. Benz, from

communicating with others as though he were Ms. Benz, from impersonating others in

communications to, for, or about Ms. Benz, from communicating with Ms. Benz in any way,

from communicating on the Internet about Ms. Benz, and from distributing any further phony

news stories about Ms. Benz.

As shown below, Ms. Benz possesses strong proof that defendant John F. Bisney has conducted this campaign against her, including admissions made by defendant John F. Bisney on material issues.  Even so, defendant John F. Bisney has done all he can to shield his identity, operating through foreign websites and using myriad fake names and IP addresses in his various messages.  For that reason, much of the evidence of his activities is stored on the computer or computers he has used to perpetrate this campaign.  As such, this evidence is peculiarly within the control of defendant John F. Bisney and peculiarly susceptible to being destroyed or altered by him.  For that reason, Ms. Benz also asks that the Court enjoin defendant John F. Bisney and his agents from altering or destroying any evidence, including evidence electronically stored, and requiring defendant John F. Bisney to deliver any and all computers in his possession, custody, or control to the clerk of this Court until such time as experts retained by Ms. Benz can examine them.

## I.    FACTS

Ms. Benz has sued Bisney for defamation, invasion of privacy—intrusion on seclusion, invasion of privacy—publication of private facts, invasion of privacy—false light, and intentional infliction of emotional distress.  In support of her motion, plaintiff, Kathleen A. Benz, has presented to the Court the following facts, taken from the First Declaration Under Penalty of Perjury of Kathleen A. Benz (hereinafter referred to as the "First Benz Declaration"), fact that establish the elements of these causes of action as well as her entitlement to emergency relief.

The First Benz Declaration is attached to this Memorandum as Exhibit A.  In the First Benz Declaration, plaintiff testifies as follows.  Ms. Kathleen A. Ben, is thirty-five (35) years of age. First Benz Declaration.  ¶¶ 1-2, 5.  She works at the Washington, D.C., office of

Cable News Network as an assignment editor.  *Id*. ¶ 7.  Her responsibilities in that job include

working the desk on weekends in the evenings and producing news segments during the week.

*Id.* ¶ 8.  Ms. Benz is unmarried and lives alone.  *Id*. ¶ 9.

        One defendant in this case, The Washington Newspaper Publishing Company

(hereinafter "Publishing Company"), publishes a free daily newspaper entitled *The Washington*

*D.C. Examiner*.  *Id*. ¶ 10.  Defendant Publishing Company distributes *The Washington D.C.*

*Examiner* Monday through Saturday to homes, on the streets, at Metro stations, and at other

locations in the District of Columbia, Maryland, and Virginia.  *Id.* ¶ 11.  Ms. Benz has often

observed copies of the *Examiner* being handed out free in Washington, D.C.  *Id.* ¶ 12.

        The other defendant in this case, John F. Bisney, is approximately fifty-one (51)

years old and a former colleague of Ms. Benz at CNN.  CNN discharged defendant John F.

Bisney in June 2005, in part because of his harassment of Ms. Benz.  *Id*. ¶¶ 13-15.  For the

entire time Ms. Benz has known defendant John F. Bisney, he was not married.  *Id*. ¶ 16.

        Ms. Benz first met defendant John F. Bisney sometime in 1997 when they were

both working for the CNN program *Crossfire*, and the two developed a social friendship

beginning in November 2002.  *Id.* ¶¶ 17-18.  In May 2005, Ms. Benz ended her friendship with

defendant John F. Bisney when she learned that defendant John F. Bisney, without her

knowledge or permission, had obtained access to her e-mails and read them, had established

and maintained websites on the World Wide Web in her name, and had posted personal and

private information about her on the Web.  *Id*. ¶ 19.

        During the period they were friends, November 2002 through May 2005, Ms.

Benz and defendant John F. Bisney attended concerts together, went to dinner together, and

took vacations together (always staying in separate hotel rooms when they did so).  *Id*. ¶¶  20-

21.  Also during their friendship, Ms. Benz accepted gifts from defendant John F. Bisney, as she would have from any other person whom she considered a friend.  *Id.* ¶ 22.  At no time did Ms. Benz ever have any type of romantic, sexual, or relationship other than one of friendship with defendant John F. Bisney.  *Id.* ¶¶ 23-25.  Ms. Benz never kissed defendant John F. Bisney romantically, never engaged in sexual intercourse with defendant John F. Bisney, never engaged in sexual or genital touching with defendant John F. Bisney, and never engaged in any behavior with defendant John F. Bisney that could be said to denote a romantic or sexual relationship.  *Id.* ¶¶ 26-29.

Ms. Benz suffers from epilepsy and migraine headaches, both of which she controls, in part, with medication, and for which she has been under the regular care of a physician.  *Id.* ¶¶ 30-32.  The epilepsy, migraine headaches, and related problems suffered by Ms. Benz are exacerbated by stress and cause her to suffer seizures, severe and debilitating headaches, nausea, and other symptoms.  Ms. Benz suffered from these medical conditions when she first met defendant John F. Bisney in 1997 and she told defendant John F. Bisney in 2002 about her conditions and how they were exacerbated by stress.  *Id.* ¶¶ 33-36.  At that time, Ms. Benz also told defendant John F. Bisney that she took medication to control these conditions and that she was under the regular care of a physician for her epilepsy, migraines, and related problem.  *Id.* ¶¶ 37-38.

From time to time throughout the period of their friendship, defendant John F. Bisney saw Ms. Benz suffer seizures, severe and debilitating headaches, nausea, migraine headaches, and saw Ms. Benz pass out.  *Id.* ¶¶ 39-43.  He also observed her Benz in the hospital, taking medication, and visiting her physicians for her treatments of these disorders. *Id.* ¶¶ 44-46.

Ms. Benz also discussed the fact that she did not have the necessary income and assets to pay her expenses and on numerous occasions, defendant John F. Bisney offered to provide money to help her out. *Id*. ¶¶ 50-51. When he did so, defendant John F. Bisney stressed that he had extensive inherited wealth, that he had numerous lucrative investments, that he had sizable discretionary income, that he had sufficient money to live without working, that he did not have any children, family, or dependents who depended on him for assistance, and that he did not expect Ms. Benz to pay back any of the money that he provided her. On the strength of his representations in this regard, Ms. Benz from time to time accepted money from Mr. Benz. *Id*. ¶¶ 52-57.

Throughout their friendship together, defendant John F. Bisney expressed to Ms. Benz his desire to have a romantic and sexual relationship with plaintiff, Kathleen A. Benz. *Id*. ¶ 58. Each time he did so—and other occasions as well—Ms. Benz replied in unequivocal language that she was only interested in being friends, that she was not interested in a romantic or sexual relationship of any type, and that she was not interested in dating defendant John F. Bisney. *Id*. ¶¶ 47-49, 59.

In March 2004, Ms. Benz discovered that defendant John F. Bisney had accessed her e-mail and read hundreds of messages without her permission. *Id*. ¶¶ 60-62. In late 2004, defendant John F. Bisney increased his pressure on Ms. Benz to enter into a romantic and sexual relationship with him, pressure that Ms. Benz continued to resist. Indeed, she told him that if he persisted in pressuring her, Ms. Benz would break off her friendship with him. *Id*. ¶¶ 63-64. At that point, defendant John F. Bisney changed his story about the money he had given Ms. Benz and began characterizing the money as a loan and demanding immediate repayment. *Id*. ¶ 65.

At about this same time in late 2004, defendant John F. Bisney sent Ms. Benz an e-mail containing an "article" authored by defendant John F. Bisney stating, in part, that Ms. Benz sought friendships with wealthy men for the purpose of procuring money from them. The fake "article" named several such targets of Ms. Benz: Gary Williams, the Maryland basketball coach; "venture capitalist" Mark Ein, "Democratic superlawyer" Julian Epstein, United States Representative Pete Session (R.TX), "Georgetown hairdresser to the stars" Paul Bosserman, John Sununu, Sr., "multi-millionaire" John Daggitt, and "recent paramour" John F. Bisney. *Id*. ¶¶ 66-67. Ms. Benz, as noted, had never dated defendant John F. Bisney. She had briefly dated Gary Williams, Paul Bosserman, Julian Epstein (over ten years before), and John Daggitt (five years before); and at no time did Ms. Benz ever seek the friendship of any of the men named in the fake article for the purpose of procuring money from them. *Id*. ¶¶ 68, 70. Defendant John F. Bisney threatened to send this "article" to *The Washingtonian* magazine if Ms. Benz did not do what he demanded. *Id*. ¶ 66.

In May 2005, Ms. Benz's father informed her that he had found two Internet Sites that were using her name, www.kathy-benz.net and www.kathy-benz.com. *Id.* ¶ 71. Ms. Benz had not established these Internet sites or authorized anyone else to do so. Upon viewing these Internet sites, Ms. Benz found that they linked to other websites dealing with negative character traits, such as narcissism, self-importance, arrogance, and haughtiness. *Id.* ¶¶ 72-76. On May 9, 2005, Ms. Benz communicated with employees of the Internet host for these two (2) websites, GoDaddy.com, and was informed that defendant John F. Bisney had established these two (2) Internet sites. *Id.* ¶¶ 77-78. Ms. Benz then told defendant John F. Bisney that she had learned from GoDaddy.com that he had established these two (2) Internet sites. In response,

defendant John F. Bisney lied, denying any involvement with establishing these two (2) Internet sites. *Id*. ¶¶ 79-80.

At that point, Ms. Benz sent an e-mail message to defendant John F. Bisney telling him not to communicate with her in any way. Defendant John F. Bisney responded by admitting that he had been responsible for creating the two (2) Internet sites and that he had lied when he denied responsibility for doing so. *Id*. ¶¶ 81-82.

Two (2) days later, while covering a press conference for her employer, CNN, Ms. Benz noticed defendant John F. Bisney pacing back and forth behind her and staring at her in a hostile and intense way, causing her to feel uncomfortable, scared, and fearful for her safety. *Id*. ¶ 84. Two (2) hours after this press conference, defendant John Bisney e-mailed Ms. Benz and commented on her physical appearance at the press conference. *Id*. ¶ 85.

The very next day, Ms. Benz learned of a third website, www.kathy-benz.org, on the World Wide Web that she had neither created nor authorized. *Id*. ¶¶ 86-88. Ms. Benz accessed this third Internet website and found that contained several statements listing unpleasant character traits about her, including, for example: "[f]eels grandiose and self-important;" "obsessed with fantasies;" "uses others to achieve her own ends;" "devoid of empathy;" and "behaves arrogantly and haughtily." *Id*. ¶¶ 89-90. Ms. Benz again contacted employees of GoDaddy.com, also the host for this third site. They told her that defendant John F. Bisney had also established this third Internet website. *Id*. ¶¶ 91-92.

Ms. Benz then communicated with friends of defendant John F. Bisney in an attempt to have them persuade defendant John F. Bisney to take this third Internet website down. *Id*. ¶ 93. After doing so, Ms. Benz checked this third Internet website and discovered that not only had it remained active, but that defendant John F. Bisney had added photographs

of Ms. Benz wearing only a bikini, photographs taken by defendant John F. Bisney while on vacation with Ms. Benz. *Id.* ¶¶ 94-95.

Ms. Benz had never known of the existence of any of these Internet sites before her father called to tell her about them. At no time did Ms. Benz ever authorize anyone to establish an Internet site in or using her name, to post on any Internet site any personal information about her, or to post on any Internet site any photographs of her. *Id.* ¶¶ 97-100.

By no later than May 10, 2005, Ms. Benz had instructed defendant John F. Bisney not to communicate with her in any way or to come near her. *Id.* ¶¶ 101-102. Despite Ms. Benz instructing the security service in her building not to permit defendant John F. Bisney to enter, on May 25, 2005, defendant John F. Bisney entered the apartment building where Ms. Benz resides and slipped a card under her door. *Id.* ¶¶ 103-104.

On June 1, 2005, Ms. Benz brought a civil action in the Superior Court of the District of Columbia and filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction requesting the Superior Court of the District of Columbia to enjoin defendant John F. Bisney from communicating with Ms. Benz in any way and from creating or maintaining any websites referring to her. *Id.* ¶¶ 105-106. On June 8, 2005, the Superior Court entered a Temporary Restraining Order against defendant John F. Bisney enjoining him "from creating or maintaining, directly or through a third party, any Internet website referring in any way to plaintiff" and providing that defendant John F. Bisney could not "'blog' or participate in any Internet chat rooms regarding plaintiff." *Id.* ¶ 107. On June 11, 2005, Ms. Benz and defendant John F. Bisney executed a "Binding Settlement Agreement and Release," which stated in part, "[t]he parties agree that they will not intentionally contact or communicate with each other." *Id.* ¶¶ 108-109.

Despite this settlement agreement, starting in July 2005, defendant John F. Bisney began a campaign of harassment, identity-theft, Internet stalking, and defamation to destroy the health, reputation, and well-being of plaintiff, Kathleen A. Benz.  *Id*. ¶ 110.  On about July 19, 2005, defendant John F. Bisney wrote a second fake news article entitled "Politics And Porn Stars," stating that Ms. Benz is dating Mark Kulkis, president and CEO of Kick Ass Pictures, a company that produces pornographic movies; that Ms. Benz is a "Washington powerdater;" that Ms. Benz told her girlfriends "Mark's a wonderful guy and I think this could be the real thing;" and that Ms. Benz is "known in Washington power circles" for dating numerous men, including Jonathan Ledecky, Gary Williams, and Mel Karmazin, with whom the article alleges that Ms. Benz "spent time last August…at his Hamptons home." *Id*. ¶¶ 111-112.  Defendant John F. Bisney posted this second fake article on numerous Internet sites, many of them containing explicit sexual material, such as "SXXXY.org," "Scuttleslut.blogspot.com," "PornNews.com," "Submittodesire.tripod.com," and numerous other sites.  *Id*. ¶ 114.

Ms. Benz has never dated or had any romantic or sexual involvement with Mark Kulkis, Jonathan Ledecky, or Mel Karmazin.  Indeed, she does not even know Mel Karmazin and has never visited him at his home in the Hamptons or anywhere else.  *Id*. ¶ 113.  Ms. Benz does know Craig Karmazin, the son of Mel Karmazin, although she has never had a romantic or sexual relationship or ever dated Craig Karmazin.  *Id*. ¶ 128.  On an occasion in 2005, defendant John F. Bisney was present when Ms. Benz spoke on the telephone with Craig Karmazin.  When he overheard her use the name "Karmazin," defendant John F. Bisney became agitated and hostile and accused Ms. Benz of having a romantic and sexual relationship with Mel Karmazin, who had once fired defendant John F. Bisney from a radio job.  *Id*. ¶¶ 129-

130.  Despite her telling him that she did not even know Mel Karmazin, defendant John F. Bisney broke down in tears.  *Id*. ¶ 130.

On about July 31, 2005, defendant John F. Bisney modified the fake article referred to above by adding additional men whom he claims Ms. Benz had romantic involvement, specifically Representative Pete Sessions, John Sunnunu, Sr., and Mark Ein.  *Id*. ¶ 115.  In other Internet postings, defendant John F. Bisney added the names of John McDonough, whom he identified as "Chicago Cubs VP," and Julian Epstein.  *Id*. ¶ 117.  Ms. Benz has never had any romantic or sexual involvement of any type with Pete Sessions, John Sunnunu, Sr., or Mark Ein, and does not know any person employed or affiliated with the Chicago Cubs, including any "John McDonough."  *Id*. ¶¶ 116, 118.  Ms. Benz has a professional, but not a sexual or romantic, relationship with John McDonough, an agent of the United States Secret Service, and had referred to Secret Service Agent John McDonough in conversations with defendant John F. Bisney.  *Id*. ¶¶ 124-125.  Defendant John F. Bisney had sent two (2) e-mails to Ms. Benz stating "you said you're not a baseball fan but you never mentioned JD," following this up with a clarification the next day that read, "McDonough (not 'JD')."  *Id*. ¶¶ 126-127.

Defendant John F. Bisney posted similar versions of these fake articles on several other websites with a photograph of Ms. Benz juxtaposed to a photograph of Mark Kulkis, including bc.indymedia.org and www.dailysexreview.com, where defendant John F. Bisney wrote:  "Finally, a relationship in which Kulkis isn't the sluttier one."  *Id.* ¶¶ 119, 122.  Defendant John F. Bisney added:  "Happy herpes!"  *Id*. ¶¶ 119.

CNN had assigned Ms. Benz to produce and cover a press conference being held June 14, 2005, by Mary Carey, a pornographic movie star who had come to Washington, D.C.,

13

with Mark Kulkis, a producer of pornographic films.  *Id.* ¶ 131.  CNN and numerous other broadcasters showed the press conference held by Mary Carey and anyone watching could have seen that Ms. Benz was covering the press conference for CNN.  *Id.* ¶ 132.  That is the extent of her relationship with Mark Kulkis.

On or about July 21, 2005, defendant John F. Bisney sent the fake news article, this time entitled "Porn Baron + CNN Producer" to WhatshappeningatCNN.blogspot.com, a website about events of interest to employees of CNN that a high percentage of CNN employees regularly read.  This article remains available there to this date.  *Id.* ¶ 135.

Since July 2005, defendant John F. Bisney has sent e-mail messages to members of the family of Ms. Benz directing them to pornographic websites where the fake articles about Ms. Benz are available.  *Id.* ¶ 136.  In addition, defendant John F. Bisney has sent the article to various associates of Ms. Benz.  For example, Ms. Benz has been involved with a charity known as "Hoop Dreams," and in August 2005, defendant John F. Bisney sent a fake e-mail message in the name of Susan Kay, the chair of the board of Hoop Dreams, to the members of the board of directors of Hoop Dreams directing those directors to the fake news articles about Ms. Benz and Mark Kulkis.  *Id.* ¶¶ 137-139.  Susan Kay did not authorize or send the e-mail message that defendant John F. Bisney sent out in her name.  *Id.* ¶ 140.  On or about August 22, 2005, defendant John F. Bisney sent a fake e-mail message purportedly from Phil Kent, the superior of Ms. Benz at CNN, stating:  "I would strongly warn you to maintain better boundaries between your life and your employment.  This is critical to maintain the professional integrity of our product."  *Id.* ¶¶ 141-142.  Mr. Kent did not send this message.  On July 31, 2005, at approximately 3:01 a.m., defendant John F. Bisney sent a fake e-mail message

from Dr. Sanjay Gupta, CNN medical correspondent, to Ms. Benz.  *Id*. ¶ 143.  Dr. Gupta did

not sent this message.  *Ibid*.

Since at least late August 2005, defendant John F. Bisney has impersonated Ms.

Benz by replying in her name with her home telephone number, personal work telephone

number, home address, and e-mail address to personal advertisements seeking sexual relations

posted on websites such as www.craigslist.com.  *Id*. ¶ 144.  Ms. Benz has never responded to

any personal ads on www.craigslist.com, yet as a result of defendant John F. Bisney's

impersonation of Ms. Benz, persons who have posted personal advertisements seeking sexual

relations on www.craigslist.com have communicated with Ms. Benz in a graphic sexual nature

in numerous telephone calls and e-mail messages.  *Id*. ¶¶ 146-148.  Ms. Benz has been severely

upset by this type of contact and fears for her safety knowing that persons seeking sexual

relations—and who believe she is seeking sexual relations with them—have been provided her

home and work telephone numbers, home address, and e-mail address by defendant John F.

Bisney.  *Id*. ¶ 149.

On about August 26, 2005, defendant John F. Bisney sent an e-mail message to

a weblog that addresses matters relating to Texas politics stating Ms. Benz was having an affair

with Representative Pete Sessions, who is married, and that Ms. Benz was having a romantic

and sexual relationship with Kinky Friedman, a Texas author and politician.  *Id*. ¶¶ 150-152.

Ms. Benz has never had a romantic or sexual relationship—and has never dated—either Rep.

Sessions or Kinky Friedman.  *Id*. ¶¶ 153-154.

On about August 19, 2005, defendant Publishing Company published in its print

publication, *The Washington D.C. Examiner*, and posted on its website, www.dcexaminer.com,

an article under the byline of one Karen Feld, entitled "Controversial Love for CNN Producer."

*Id*. ¶¶ 155-156.  This article contained—word for word—the false and defamatory statements Ms. Benz that defendant John F. Bisney had been sending to various other websites.  Defendant Publishing Company did not attempt to speak or attempt to speak with Ms. Benz before publishing this article.  *Id*. ¶ 157.  When Ms. Benz spoke with Karen Feld and told Ms. Feld that the article was false, Ms. Feld told her that defendant Publishing Company would not print a retraction and that Ms. Benz should "just get used to it."  *Id*. ¶¶ 159-169.

Ms. Benz has never suffered from this type of harassment, defamation, annoyance, and intimidation from anyone else and cannot conceive of anyone who would subject her to this other than defendant John F. Bisney.  *Id*. ¶¶ 170-171.  Other than defendant John F. Bisney, no one Ms. Benz has ever known has ever engaged in the activities set forth above with regard to her or anyone else she knows, or so much has threatened to do so.  *Id*. ¶ 172.  As a result of what Ms. Benz has been through in the past two (2) months, she has suffered a worsening of her symptoms, including headaches, seizures, nausea, extreme anxiety, and other despair that her reputation is being ruined in this way.  *Id*. ¶ 173.  Ms. Benz is a private person and it causes her deep anguish and embarrassment to have her life exposed on the Internet as it has been.  It is especially troublesome to Ms. Benz that defendant John F. Bisney has directed his false and scurrilous statements about her to her family and to her colleagues at CNN.  *Id*. ¶¶ 174-175.

## II.     GOVERNING LAW

The same balancing test governs Ms. Benz's application for a temporary restraining order as governs an application for a preliminary injunction.  This Court accordingly should "measur[e] plaintiff's request [for a TRO] by the well-established standards for

preliminary injunctive relief." *National Football League Properties, Inc. v. Coniglio*, 554 F.Supp. 1224, 1225 (DDC 1983). This Court in *NFL Properties*, *supra*, then applied the familiar four-part developed in the federal courts in connection with motions for preliminary injunctions. *Ibid*. *E.g*., *Al-Fayed v. Central Intelligence Agency,* 254 F.3d 300, 303 n.2 (CADC 2001). The standards governing the decision on a motion for a preliminary injunction require this Court to "weigh four factors: (1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction wold substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest." *Al-Fayed v. Central Intelligence Agency, supra*, 254 F.3d at 303.

Weighing these four (4) factors, this Court cannot escape the conclusion that Ms. Benz has established her entitlement to a temporary restraining order.

### A.    Irreparable Harm to Plaintiff

Ms. Benz has suffered and continues to suffer irreparable injury as a result of the conduct of defendant John F. Bisney. What defendant John F. Bisney has said about Ms. Benz and the lengths he has gone to distribute his libels, as well as his activities impersonating her and others, could not be better designed to destroy her emotional and physical well-being. Take but one example: defendant John F. Bisney impersonated the head of the Hoop Dreams foundation and sent a letter in that person's name to the board of directors bringing to the board's attention the phony news articles defaming Ms. Benz that defendant John F. Bisney himself had written. If allowed to continue in this way, defendant John F. Bisney will cause more and more harm to Ms. Benz that cannot be repaired. Defendant John F. Bisney will destroy Ms. Benz's already fragile health.

Another example:  defendant John F. Bisney continues to harass Ms. Benz by replying in her name to personal ads posted on the website www.craigslist.com seeking sexual encounters.  Defendant John F. Bisney supplied the persons posting the advertisements with Ms. Benz's work telephone number and e-mail address, and as a result, salacious calls making sexual explicit requests flood Ms. Benz at work and on line.  If not stopped, his activities will continue to inflict irreparable harm beyond what they have already caused.

### B.    Harm To Defendant

Defendant John F. Bisney will suffer no harm if this preliminary injunction is granted.  Defendant John F. Bisney will merely be enjoined from impersonating Ms. Benz and others, from posting or sending false information about her, from communicating with her, and from his continuing harassment and intimidation from her.  Any suggestion to the contrary is fatuous.

Nor will defendant John F. Bisney suffer if the Court enjoins him from altering or destroying his computers or any information contained in them.  Defendant John F. Bisney and his attorneys are under an obligation in any event not to destroy such evidence.  But such evidence is peculiarly evanescent, in that it never exists outside cyberspace.  There is no likelihood that copies will turn up or someone else will have knowledge of the existence of the evidence, as there is with paper documents.  It works no hardship on defendant John F. Bisney to enjoin him to do what the law otherwise requires, but will have a hard time policing after the fact of spoliation.  Indeed, it is difficult to see what objection defendant John F. Bisney legitimately make to this aspect of Ms. Benz's motion.

Nor does it work a hardship to make defendant John F. Bisney turn his computers over the clerk pending examination by experts retained by plaintiff, Kathleen A. Benz. The period will be brief. The computers will suffer no harm.

Defendant John F. Bisney can make no credible argument that the harm to him, theoretical though it be, could possibly outweigh the continuing harm to Ms. Benz if this Temporary Restraining Order is not granted.

### C.    Likelihood of Success on Merits

Ms. Benz will without doubt succeed on the merits in her action against defendant John F. Bisney. Even a brief review of the evidence confirms this.

Despite defendant Bisney's attempts to hide in the anonymity he seems to think the Internet affords him, the evidence is overwhelming that he is the source of this campaign against Ms. Benz. The fake articles Bisney disseminated all bear a strong resemblance to the initial fake article that he sent Ms. Benz in his own email. The men named in the fake articles as involved with plaintiff—Karmazin, McDonough, Kulkis, for example—are persons that Bisney knew about and in various emails and conversations discussed with Ms. Benz. Bisney previously established fake websites in Ms. Benz's name, posting photographs of her that he had taken. Bisney has a history—one he admitted in the settlement of the Superior Court case—of misusing the Internet to harm Ms. Benz. He has a history of stalking her. He has demonstrated that he will make defamatory remarks about her on the Web.

Ms. Benz knows of no other person who has behaved toward her as Bisney has, behavior for which Bisney lost his job at CNN. As she states in her Declaration, she cannot so much as conceive of anyone else she knows behaving in this way. Indeed the various phony email messages and fake articles attached as exhibits to the Complaint point

directly at Bisney as their source: his use of the names of various persons at CNN, his knowledge of Ms. Benz's professional acquaintances, his overhearing of her conversation with Craig Karmazin, his knowledge that she knew someone named John McDonough, his awareness of her involvement with Hoop Dreams, his knowledge of her phone numbers and addresses, his invasion of her email messages, and on an on. So, too, does the pathetic note of the spurned lover that runs throughout the various libels perpetrated against Ms. Benz betray Bisney as their author.

There can be little doubt Ms. Benz will prevail in her action against Bisney for defamation, invasion of privacy, and intentional infliction of emotional distress.

### D.    The Public Interest

The public has a strong interest in stopping the fraud defendant John F. Bisney is perpetrating on it by his impersonation of Ms. Benz, the head of Hoop Dreams, various CNN employees, and others. The public has a strong interest in stopping defendant John F. Bisney from continuing to post his phony news articles all over the World Wide Web as though they constituted news, when he and everyone else knows them to be utter fabrication. The public similarly has a strong interest in stopping this campaign of intimidation and harassment of Ms. Benz.

### III.    CONCLUSION

The Motion For Temporary Restraining Order Pursuant To FED. RULE CIV. PRO. 65(b) Of Plaintiff, Kathleen A. Benz, should be granted.

Respectfully submitted,

LAW OFFICES OF
WILLIAM ALDEN McDANIEL, JR.


William Alden McDaniel, Jr.


Bassel Bakhos
*Pro Hac Vice Pending*

118 West Mulberry Street
Baltimore, Maryland 21201
Tel.:  410.685.3810
Fax:  410.685.0203
wam@wamcd.com
bb@wamcd.com

*Lawyers for Plaintiff, Kathleen A. Benz*

MPA TRO Final.doc

LAW OFFICES OF
WILLIAM ALDEN McDANIEL, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATHLEEN A. BENZ,                                        )
    Apartment 208                                        )
    450 Massachusetts Avenue, N.W.                       )
    Washington, D.C. 20001-6203,                         )
                                            )
        Plaintiff,                                   )
                                            )
v.                                                       )        Civil Action No. _____
                                            )
THE WASHINGTON NEWSPAPER                                  )
  PUBLISHING COMPANY, LLC,                                )
    6408 Edsall Road                                     )
    Alexandria, Virginia 22312,                          )
                                            )
    SERVE:                                               )
                                            )
    C. T. CORPORATION SYSTEM,                            )
    Suite 1000                                           )
    1015 Fifteenth Street, N.W.                          )
    Washington, D.C. 20005,                              )
                                            )
And                                                      )
                                            )
JOHN F. BISNEY,                                          )
    5803 Ryland Drive                                    )
    Bethesda, Maryland 20817-2538,                       )
                                            )
        Defendants.                                  )
_____)

**FIRST DECLARATION UNDER PENALTY OF PERJURY OF KATHLEEN A. BENZ**

        **KATHLEEN A. BENZ**, upon personal knowledge and under penalty of

perjury, declares as follows:

        1.      My name is Kathleen A. Benz.

2.      I am thirty-five (35) years of age.

3.      I am competent to testify to the matters set out below.

4.      I testify to the matters set out below from my own personal knowledge.

5.      I am the plaintiff in this case.

6.      I reside at Apartment 208, 450 Massachusetts Avenue, N.W., Washington, D.C., 20001-6203.

7.      The Washington, D.C., office of Cable News Network (hereinafter referred to as "CNN") employs me as an assignment editor.

8.      At CNN, my responsibilities include working the desk on weekends in the evenings and producing news segments during the week.

9.      I am unmarried and live alone.

10.     Defendant The Washington Newspaper Publishing Company, LLC publishes a free daily newspaper entitled *The Washington D.C. Examiner*.

11.      Defendant The Washington Newspaper Publishing Company, LLC distributes *The Washington D.C. Examiner* Monday through Saturday to homes, on the streets, at Metro Stations, and at other locations in the District of Columbia, Maryland, and Virginia.

12.     I have often observed copies of the *Examiner* being handed out free in Washington, D.C.

13.     Defendant John F. Bisney is a former CNN Radio correspondent and my former colleague at CNN.

14.     In or about June 2005, CNN discharged defendant John F. Bisney in part because of his harassment of me, as more fully described below.

15.     Defendant John F. Bisney is approximately fifty-one (51) years of age.

16.     For the entire time I have known defendant John F. Bisney, he was not married.

17.     I first met defendant John F. Bisney sometime in 1997 while we both worked on the CNN program *Crossfire*.

18.     Beginning in or about November 2002, defendant John F. Bisney and I developed a social friendship.

19.     I ended my friendship with defendant John F. Bisney in May 2005 when I learned that defendant John F. Bisney, without my knowledge or permission, among other things, had obtained access to my electronic mail (hereinafter referred to as "e-mail") and read them and had established and maintained websites on the World Wide Web my name, and posted personal and private information regarding and photographs of me thereon, all as alleged more fully below.

20.     During the period of my friendship with defendant John F. Bisney from November 2002 to May 2005, I from time to time attended concerts, went out to dinner, and took vacations with defendant John F. Bisney.

21.     When Defendant John F. Bisney and I traveled together, we always stayed in separate hotel rooms.

22.     Also during the period of my friendship with defendant John F. Bisney from November 2002 to May 2005, I accepted gifts from defendant John F. Bisney as I would from any other person whom I considered a friend.

23.     At no time ever have I had any type of romantic relationship with defendant John F. Bisney.

24.     At no time ever have I had any type of sexual relationship with defendant John F. Bisney.

25.     At no time ever have I had any type of relationship with defendant John F. Bisney other than one of friendship.

26.     I have never kissed defendant John F. Bisney romantically.

27.     I have never engaged in sexual intercourse with defendant John F. Bisney.

28.     I have never engaged in sexual or genital touching with defendant John F. Bisney.

29.     I have never engaged in any behavior with defendant John F. Bisney that could be said to denote a romantic or sexual relationship of any kind.

30.     I suffer from epilepsy, a disorder that I in part control with medication.

31.     I also suffer from frequent migraine headaches, a condition I in part control with medication.

32.     At all times material to the allegations of the Complaint in this case, I have been under the regular care of a physician for my epilepsy, migraines, and related problems.

33.     Stress exacerbates the epilepsy and the migraines suffered by me by, among other things, causing me to suffer seizures, severe and debilitating headaches, nausea, and other symptoms.

34.     I suffered from this disorder of epilepsy, migraines, and related problems and when I first met defendant John F. Bisney in 1997.

35.    In or about 2002, I told defendant John F. Bisney that I suffered from epilepsy, migraines, and related problems.

36.    In or about 2002, I told defendant John F. Bisney that stress exacerbated the epilepsy, migraines, and related problems, suffered by me by, among other things, causing me to pass out and to suffer seizures, severe and debilitating headaches, nausea, and other symptoms.

37.    In or about 2002, I told defendant John F. Bisney that I took medication to control my epilepsy, migraines, and related problems.

38.    In or about 2002, I told defendant John F. Bisney that I was under the regular care of a physician for epilepsy, migraines, and related problems.

39.    From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer seizures.

40.    From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer severe and debilitating headaches.

41.    From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer nausea.

42.    From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer migraine headaches.

43.    From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me pass out.

44. From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me in the hospital for treatment of my epilepsy, migraines, and related symptoms.

45. From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me take medication for my epilepsy, migraines, and related problems.

46. From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me visit a physician for treatment of my epilepsy, migraines, and related problems.

47. Throughout the period of my friendship with defendant John F. Bisney, I repeatedly told defendant John F. Bisney in unequivocal language that I was not interested in a romantic or sexual relationship of any type with him.

48. Throughout the period of my friendship with defendant John F. Bisney, I repeatedly told defendant John F. Bisney in unequivocal language that I was not interested in dating him.

49. Throughout the period of my friendship with defendant John F. Bisney, I repeatedly told defendant John F. Bisney in unequivocal language that I was only interested in being his friend.

50. From time to time during the period of my friendship with defendant John F. Bisney, I discussed with defendant John F. Bisney the fact that my income and assets were inadequate to pay my expenses.

51. On numerous occasions, defendant John F. Bisney offered to provide money to me to help me pay my expenses.

52.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had extensive inherited wealth.

53.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had numerous lucrative investments.

54.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had sizeable discretionary income.

55.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he did not need to work because he had sufficient money to live without working.

56.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had no children, family, or dependents who depended upon him for assistance or support.

57.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he did not expect me to pay back any of the money he provided me.  On the basis of these representations, I accepted money from time to time from defendant John F. Bisney as a gift.

58.     Throughout the friendship between defendant John F. Bisney and me, defendant John F. Bisney expressed his desire to have a romantic and sexual relationship with me.

59.     On each occasion when defendant John F. Bisney expressed this desire, I told him that I was not interested in any such relationship with defendant John F. Bisney.

60.     In or about March 2004, I discovered that defendant John F. Bisney had accessed my e-mail and read hundreds of e-mail messages stored therein.

61.     At no time did I ever authorize defendant John F. Bisney to access my e-mail for any reason.

62.     At not time did I ever authorize defendant John F. Bisney to read e-mails stored in my e-mail account.

63.     In late 2004, defendant John F. Bisney increased his pressure on me to have a romantic and sexual relationship with him.

64.     In response to this pressure, I repeatedly told defendant John F. Bisney that I did not want a romantic or sexual relationship with him and would not engage in one and that if he persisted in pressuring me, I would break off my friendship with him.

65.     When so rebuffed by me, defendant John F. Bisney changed his story and told me that the money he had given me had not been a gift but a loan and demanded immediate repayment.

66.     At or about this same time in late 2004, defendant John F. Bisney sent me an e-mail containing an "article" authored by defendant John F. Bisney stating that I sought friendships with wealthy men for the purpose of procuring money from them.  Defendant John F. Bisney threatened to send this "article" to *The Washingtonian* magazine if I did not do what he demanded.  A complete and accurate photocopy of this e-mail message is attached to the Complaint in this case as Exhibit 1 and is incorporated herein by reference.

67. This fake "article" in the e-mail message from defendant John F. Bisney, Exhibit 1, named the following persons as having been targets of my procurement activities: Gary Williams, the basketball coach at the University of Maryland; Mark Ein, identified in the message as a "venture capitalist;" Julian Esptein, identified in the message as a "Democratic superlawyer;" United States Representative Pete Sessions; Paul Bosserman, identified in the message as "Georgetown hairdresser to the stars;" John Sunnunu, Sr., former chief of staff to President George H.W. Bush; John Daggitt, identified in the message as a "multi-millionaire," and whom I was allegedly engaged to; and defendant John F. Bisney, described in the message as "a recent paramour" of mine.

68. Of all the men named in this fake article, Exhibit 1, I had briefly dated only Gary Williams, Paul Bosserman, Julian Epstein (over ten years before), and John Daggitt (five years before).

69. I had never in any way dated or been romantically or sexually involved with any of the other men named in this fake article, Exhibit 1.

70. At no time did I ever seek the friendship of any of these men or of anyone else for the purpose of seeking money from them.

71. In or about May 2005, my father, James C. Benz, told me that by chance he had found two (2) Internet sites, www.kathy-benz.net and www.kathy-benz.com.

72. I had not established any such Internet sites.

73. I had never authorized anyone to establish any such Internet sites.

74. The first that I ever heard of these Internet sites was when my father told me of their existence.

75.     Upon learning of the existence of these two (2) Internet sites, I viewed them on the World Wide Web.

76.     Each of these two (2) Internet websites linked to other websites that dealt with negative character traits, such as narcissism, self-importance, arrogance, and haughtiness.

77.     On or about May 9, 2005, I communicated with employees of the Internet host for these two (2) websites, GoDaddy.com.

78.     Employees of GoDaddy.com informed me that defendant John F. Bisney had established the two (2) Internet sites.

79.     On or about May 9, 2005, I told defendant John F. Bisney what I had learned from GoDaddy.com about him having established the two (2) Internet sites.

80.     In reply, defendant John F. Bisney denied that he had any involvement with establishing those two (2) Internet websites.

81.     I then sent an e-mail message to defendant John F. Bisney telling him not to communicate with me in any way.

82.     Defendant John F. Bisney replied admitting to me that he had in fact been responsible for establishing the two (2) Internet sites and that he had lied when he denied responsibility for doing so.

83.     At some point thereafter, I was no longer able to access these Internet websites.

84.     On or about May 16, 2005, while covering a press conference for my employer, CNN, I noticed defendant John F. Bisney pacing back and forth behind me and staring at me in a hostile and intense way, causing me to feel uncomfortable, scared, and fearful for my safety.

85.     Also on May 16, 2005, some two (2) hours after this press conference, defendant John F. Bisney e-mailed me and commented on my physical appearance at the press conference.

86.     On or about May 17, 2005, I learned of the existence of a third Internet website about me on the World Wide Web, www.kathy-benz.org.

87.     I had not created the third Internet website, www.kathy-benz.org.

88.     I had not authorized anyone to create the third Internet website, www.kathy-benz.org.

89.     On or about May 14, 2005, I viewed the third Internet website, www.kathybenz.org.

90.     On this third Internet website, www.kathy-benz.org, I found a page headed "Looks are deceiving.  Boys Do you know anyone like this?'  This heading was followed by several statements listing unpleasant character traits, for example:  "[f]eels grandiose and self-important;" "obsessed with fantasies;" "uses others to achieve her own ends;" "devoid of empathy;" and "behaves arrogantly and haughtily."

91.     After I located this third Internet Website, www.kathy-benz.org, I communicated with employees of GoDaddy.com, the host for this third Internet website.

92.     The employees of GoDaddy.com informed me that this third Internet website, www.kath-ybenz.org, had been established by defendant John F. Bisney.

93.     After learning that defendant John F. Bisney was behind this third Internet website, www.kathy-benz.org, I communicated with friends of defendant John F. Bisney and told them what I had discovered about this third Internet website and that I wanted them to persuade defendant John F. Bisney to take this third Internet website down.

94.     After I communicated with the friends of defendant John F. Bisney, I again checked and found that this third Internet website remained active.

95.     After I communicated with the friends of defendant John F. Bisney, I discovered that defendant John F. Bisney had added to the third Internet website, www.kathy-benz.org, photographs of me wearing only a bikini taken by defendant John F. Bisney while on vacation with me.

96.     Attached to the Complaint in this case as Exhibit 2 and incorporated herein are several pages downloaded from www.kathy-benz.org.

97.     I had never known of the existence of any of these Internet sites before my father called to tell me about them.

98.     At no time did I ever authorize anyone to establish an Internet site in or in any way using my name.

99.     At no time did I ever authorize anyone to post on any Internet site any personal information about me.

100.    At no time did I ever authorize anyone to post on any Internet site any photographs of me.

101.    By no later than May 10, 2005, I had on several occasions instructed defendant John F. Bisney not to communicate with me in any way.

102.    By no later than May 10, 2005, I had instructed defendant John F. Bisney not to come near me.

103.    On or about May 21, 2005, I instructed the security service in my building not to permit defendant John F. Bisney to enter.

104. On or about May 25, 2005, defendant John F. Bisney entered the apartment building where I reside and slipped a card under my apartment door.

105. On or about June 1, 2005, I brought a civil action in the Superior Court of the District of Columbia styled *Benz v. Bisney*, Case No. CA-05-4205 (hereinafter referred to as "the D.C. Superior Court Case"). A complete and accurate photocopy of the Complaint that I filed in the D.C. Superior Court Case is attached to the Complaint in this case as Exhibit 3 and is incorporated herein by reference.

106. Along with my Complaint, I filed Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction requesting the Superior Court of the District of Columbia to enjoin defendant John F. Bisney from communicating with me in any way and from creating or maintaining any websites referring to me.

107. On June 8, 2005, Judge Henry F. Greene of the Superior Court of the District of Columbia, signed a Temporary Restraining Order enjoining defendant John F. Bisney "from creating or maintaining, directly or through a third party, any Internet website referring in any way to plaintiff" and providing that defendant John F. Bisney could not "'blog' or participate in any Internet chat rooms regarding plaintiff." A complete and accurate photocopy of that Temporary Restraining Order is attached to the Complaint in this case as Exhibit 4 and is incorporated herein by reference.

108. On July 11, 2005, defendant John F. Bisney and I executed a document entitled "Binding Settlement Agreement and Release" regarding the D.C. Superior Court Case (hereinafter referred to as "the D.C. Superior Court Case Settlement Agreement"). A complete and accurate photocopy of the Binding Settlement Agreement and Release is attached to the Complaint in this case as Exhibit 5 and is incorporated herein by reference.

109.    Paragraph 2 of the D.C. Superior Court Case Settlement Agreement provides that "[t]he parties agree that they will not intentionally contact or communicate with each other."

110.    Notwithstanding the pendency of the D.C. Superior Court Case and his execution of the D.C. Superior Court Case Settlement Agreement, from in or about July 2005 and continuing through the date of the Complaint in this case defendant John F. Bisney has engaged in a campaign of harassment, identity-theft, Internet stalking, and defamation to destroy my health, reputation, and well-being..

111.    For example, defendant John F. Bisney on or about July 19, 2005, wrote a second fake news article, this one entitled "Politics And Porn Stars."  This second fake news article was very close in content to the initial fake news article attached to the Complaint in this case as Exhibit 1.  A complete and accurate photocopy of this second fake news article is attached to the Complaint in this case as part of Exhibit 6 and is incorporated herein by reference.

112.    In this second fake news article, Exhibit 6, defendant John F. Bisney states that I am dating Mark Kulkis, president and CEO of Kick Ass Pictures, a company that produces pornographic movies; that I am a "Washington powerdater;" that I told my girlfriends "Mark's a wonderful guy and I think this could be the real thing;" and that I am "known in Washington power circles" for dating numerous men, identifying them by name as:  Jonathan Ledecky, a "venture capitalist;" Gary Williams; and Mel Karmazin, CEO of Sirius,  with whom the article alleged that I had "spent time last August … at his Hamptons home."

113.    I never dated or had any romantic or sexual involvement of any type with Mark Kulkis, Jonathan Ledecky, or Mel Karmazin and indeed, did not and do not even

know Mel Karmazin and have never visited the home of Mel Karmazin in the Hamptons or anywhere else.

114.    Defendant John F. Bisney sent this second fake article, Exhibit 6, all around the World Wide Web by posting it on numerous Internet sites, many of them containing explicit sexual material, such as "SXXXY.org," "Scuttleslut.blogspot.com," "PornNews.com," "Submittodesire.tripod.com," and numerous other sites.

115.    In or about July 31, 2005, defendant John F. Bisney modified the fake article, Exhibit 6, by adding additional men with whom I had romantic involvement, specifically Representative Pete Sessions, John Sunnunu, Sr., and Mark Ein.  A complete and accurate of this further-modified fake article is attached to the Complaint in this case as part of Exhibit 6 and is incorporated herein by reference.

116.    I never had any romantic or sexual involvement of any type, and never dated, Sessions, Sunnunu, or Ein.

117.    In other postings on the World Wide Web, defendant John F. Bisney added the names of John McDonough, identified by defendant John F. Bisney as a "Chicago Cubs VP," and Julian Esptein.

118.    I do not know any person employed by or affiliated with the Chicago Cubs, including any "John McDonough."

119.    Defendant John F. Bisney posted similar versions of the articles contained in Exhibit 6 on several other websites, including www.dailysexreview.com.  In his posting on this website, defendant John F. Bisney alleges I am dating Mark Kulkis and writes: "Finally, a relationship in which Kulkis isn't the sluttier one.  Happy herpes!"  A complete and

accurate photocopy of this posting, as printed from the World Wide Web, is attached to the

Complaint in this case as Exhibit 7 and is incorporated herein by reference.

120.    I am not and have never been a "slut."

121.    Defendant John F. Bisney has distributed the fake article linking me with

Kulkis with a photograph of me juxtaposed to a photograph of Kulkis.

122.    One Internet website to which defendant John F. Bisney distributed the

fake article linking me with Kulkis and containing photographs of me and Kulkis is

bc.indymedia.org.  A complete and accurate photocopy of the fake article as downloaded from

that Internet website is attached to the Complaint in this case as Exhibit 8 and is incorporated

herein by reference.

123.    I have a professional acquaintance with John McDonough, an agent of

the United States Secret Service.

124.    I have never had any type of sexual or romantic relationship and have

never dated Secret Service Agent John McDonough.

125.    I referred to Secret Service Agent John McDonough in conversations in

front of defendant John F. Bisney.

126.    On or about May 13, 2005, at 12:31 a.m. E.D.T., defendant John F.

Bisney sent an e-mail message to me that said (among other things):  "Hey you said you're not

a baseball fan but you never mentioned JD."  A complete and accurate photocopy of this e-mail

message is attached to the Complaint as Exhibit 9 and is incorporated herein by reference.

127.    On or about May 13, 2005, at 6:16 a.m. E.D.T., defendant John F.

Bisney sent me an e-mail message, with a subject line that sated "Correction."  This e-mail

stated: "McDonough (not 'JD')." A complete and accurate photocopy of this e-mail message is attached to the Complaint in this case as Exhibit 10 and is incorporated herein by reference.

128.    I do know Craig Karmazin, the son of Mel Karmazin, though I have never had any type of sexual or romantic relationship with Craig Karmazin and have never dated him.

129.    On an occasion in 2005, defendant John F. Bisney was present and within hearing distance while I spoke on the telephone with Mel Karmazin's son, Craig.

130.    After overhearing the part of this conversation conducted by me, defendant John F. Bisney became agitated and hostile and accused me of having a romantic and sexual relationship with Mel Karmazin who, defendant John F. Bisney told her, had once fired defendant John F. Bisney from a radio job. I told him that I did not even know Mel Karmazin, but he broke down crying.

131.    CNN assigned me to produce and cover a press conference being held June 14, 2005, by Mary Carey, a pornographic movie star who had come to Washington, D.C., with Mark Kulkis, a producer of pornographic films. This was the extent of my relationship with Mark Kulkis.

132.    CNN and numerous other broadcasters broadcast the press conference held by Mary Carey and anyone watching could have seen that I was covering this press conference for CNN.

133.    Attached to the Complaint in this case as Exhibit 11 are photocopies of sixteen (16) of the hundreds of articles on various websites on the World Wide Web containing the various versions of the fake news story published by defendant John F. Bisney about me.

134.    Among the websites to which defendant John F. Bisney has sent the fake news articles is one entitled WhatshappeningatCNN.blogspot.com, a website about events of interest to employees of CNN.  A high percentage of CNN employees read this website.

135.    On July 21, 2005, a version of the fake news article published by defendant John F. Bisney about me this one entitled "Porn Baron + CNN Producer," appeared on the website WhatshappeningatCNN.blogspot.com, where it remains available to this date.  A complete and accurate photocopy of this version of the fake news article is attached to the Complaint in this case as Exhibit 12 and is incorporated herein by reference.

136.    Since in or about July 2005, defendant John F. Bisney has sent e-mail messages to members of my family, directing them to pornographic websites where the fake articles about me are available.

137.    I have had involvement as a volunteer with a charity known as "Hoop Dreams," which provides college scholarships to the youth of the District of Columbia, college and career mentoring, SAT preparation, internships and job connections, and community service.

138.    The chair of the board of Hoop Dreams is Susan Kay.

139.    In or about August 2005, defendant John F. Bisney sent a fake e-mail message in the name of Susan Kay to some members of the board of directors of Hoop Dreams directing those directors to the fake news articles about me.

140.    Susan Kay did not authorize or send the e-mail message that defendant John F. Bisney sent out in my name.

141.    On or about August 22, 2005, defendant John F. Bisney sent a fake e-mail message to me purporting to be from my superior at CNN, Phil Kent.  A complete and

accurate photocopy of that e-mail message is attached to the Complaint in this case as Exhibit 13 and is incorporated herein by reference.

142.    In Exhibit 13, defendant John F. Bisney stated:  "I would strongly warn you to maintain better boundaries between your life and your employment.  This is critical to maintain the professional integrity of our product."

143.    On or about July 31, 2005, at approximately 3:01 a.m. defendant John F. Bisney sent a fake e-mail message from Dr. Sanjay Gupta, Medical Correspondent for CNN, to me forwarding an article entitled "U.S. Warns Fentanyl Patients About Drug."  I sent an e-mail message to Dr. Gupta asking about this purported message.  Dr. Gupta denied sending the e-mail message or having any knowledge about the message.  Complete and accurate photocopies of these e-mail messages are attached to the Complaint in this case as Exhibit 14 and are incorporated herein by reference.

144.    Since on or about August 25, 2005, defendant John F. Bisney has impersonated me by replying in my name with my home telephone number, my personal work telephone number, my home address, and my e-mail address to personal advertisements seeking sexual relations that were posted on a website known as www.craigslist.com.

145.    As a result of this impersonation of me by defendant John F. Bisney, persons who have posted personal advertisements seeking sexual relations on a website known as www.craigslist.com, have communicated with me in numerous telephone calls and e-mail messages from persons who believe I desires to engage in sexual relations with them.

146.    I have never responded to any personal ads on www.craigslist.com.

147.    Attached to the Complaint in this case as Exhibit 15 and is incorporated herein by reference are complete and accurate photocopy of some of fake responses posted by

defendant John F. Bisney at www.craigslist.com impersonating me with the phone numbers and addresses of plaintiff, Kathleen A. Benz.

148.    The e-mails and telephone calls contain graphic sexual content and have severely upset me.

149.    I fear for my safety, knowing that persons who are seeking sexual relations and who believe I am also seeking sexual relations have been provided my home and work telephone numbers, my home address, and my e-mail address by defendant John F. Bisney.

150.    On or about August 26, 2005, defendant John F. Bisney sent an e-mail message to a weblog that addresses matters relating to Texas politics.  A complete and accurate photocopy of this e-mail message is attached to the Complaint in this case as Exhibit 16 and is incorporated herein by reference.

151.    In this message, Exhibit 15, defendant John F. Bisney stated that I was having an affair with Representative Pete Sessions, who is married.

152.    In this message, Exhibit 15, defendant John F. Bisney also stated that I have a romantic and sexual relationship with one Kinky Friedman, a Texas author and politician.

153.    As noted, I have never had any type of romantic or sexual relationship with Rep. Sessions, nor have I ever dated him.

154.    I have never had any type of sexual or romantic relationship, and have never dated, Kinky Friedman.

155.    On or about August 19, 2005, defendant The Washington Newspaper Publishing Company, LLC published in its print publication, *The Washington D.C. Examiner*,

an article under the byline of one Karen Feld, entitled "Controversial Love for CNN Producer," (hereinafter referred to as "the *Examiner* Article"). A complete and accurate photocopy of the *Examiner* Article as it appeared in the print edition of *The Washington D.C. Examiner* is attached to the Complaint in this case as Exhibit 17 and is incorporated herein by reference.

156.    Defendant The Washington Newspaper Publishing Company, LLC posted the *Examiner* Article on *The Washington Examiner*'s website at www.dcexaminer.com, where, as of the date of the filing of the Complaint in this case, it remains available to members of the public with Internet access. A complete and accurate photocopy of the *Examiner* Article as it was downloaded from the website of *The Washington Examiner* is attached to the Complaint in this case as Exhibit 18 and is incorporated herein by reference.

157.    Prior to publishing the *Examiner* Article in print and on its website, defendant The Washington Newspaper Publishing Group, LLC did not speak or attempt to speak with me.

158.    It was the *Examiner* Article that defendant John F. Bisney sent to the members of the board of directors of the Hoop Dreams foundation, as alleged above.

159.    On or about August 19, 2005, I telephoned Karen Feld, the person whose byline appeared on the *Examiner* Article.

160.    Karen Feld refused to take my August 19, 2005, telephone call.

161.    On at least three (3) more occasions August 19, 2005, I telephoned Karen Feld.

162.    Karen Feld refused to take any of my telephone calls August 19, 2005.

163.    When Karen Feld refused to take my telephone calls, I left a message asking Karen Feld to call back.

164.    Karen Feld failed to return any of my numerous telephone calls August 19, 2005.

165.    The next day, on or about August 20, 2005, I succeeded in reaching Karen Feld by telephone by pretending to be a social friend of Karen Feld.

166.    In that telephone call, I told Karen Feld that the *Examiner* Article was substantially false.

167.    In that telephone call, I also demanded that the *Examiner* print a retraction.

168.    In reply, Karen Feld told me that the *Examiner* would not print a retraction.

169.    Further in reply, Karen Feld told me to "just get used" to such stories.

170.    I have never suffered from this type of harassment, defamation, annoyance, and intimidation from anyone else.

171.    I cannot conceive of anyone who would subject me to this other than defendant John F. Bisney.

172.    Other than defendant John F. Bisney, no one I have ever known has ever engaged in the activities set forth above with regard to me or anyone else I know, or so much has threatened to do so.

173.    As a result of what I have been through in the past two (2) months, I have suffered a worsening of my symptoms.  This includes headaches, seizures, nausea, extreme anxiety, and utter despair that my reputation is being ruined in this way.

174.    I am a private person and it causes me deep anguish and embarrassment to have my life exposed on the Internet as it has been.

175.    It is especially troublesome to me that defendant John F. Bisney has directed his false and scurrilous statements about me to my family and to my colleagues at CNN.

**THIS ENDS MY DECLARATION.**

First Decln KB.doc

I declare under penalty of perjury that the foregoing is true and correct.  Executed

on

August 31, 2005.

28 U.S.C. § 1746(2)

Kathleen A. Benz