IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATHLEEN A. BENZ,                                    )
      Apartment 208                               )
      450 Massachusetts Avenue, N.W.             )
      Washington, D.C. 20001-6203,               )
                                                 )
          Plaintiff,                         )
                                                 )
v.                                                   )     Civil Action No. _____
                                                 )
THE WASHINGTON NEWSPAPER                              )
  PUBLISHING COMPANY, LLC,                          )
      6408 Edsall Road                           )
      Alexandria, Virginia 22312,                )
                                                 )
      SERVE:                                     )
                                                 )
      C. T. CORPORATION SYSTEM,                  )
      Suite 1000                                 )
      1015 Fifteenth Street, N.W.                )
      Washington, D.C. 20005,                    )
                                                 )
And                                                  )
                                                 )
JOHN F. BISNEY,                                      )
      5803 Ryland Drive                          )
      Bethesda, Maryland 20817-2538,             )
                                                 )
          Defendants.                        )
_____)

**FIRST DECLARATION UNDER PENALTY OF PERJURY OF KATHLEEN A. BENZ**

      **KATHLEEN A. BENZ**, upon personal knowledge and under penalty of

perjury, declares as follows:

      1.     My name is Kathleen A. Benz.

2.      I am thirty-five (35) years of age.

3.      I am competent to testify to the matters set out below.

4.      I testify to the matters set out below from my own personal knowledge.

5.      I am the plaintiff in this case.

6.      I reside at Apartment 208, 450 Massachusetts Avenue, N.W., Washington, D.C., 20001-6203.

7.      The Washington, D.C., office of Cable News Network (hereinafter referred to as "CNN") employs me as an assignment editor.

8.      At CNN, my responsibilities include working the desk on weekends in the evenings and producing news segments during the week.

9.      I am unmarried and live alone.

10.     Defendant The Washington Newspaper Publishing Company, LLC publishes a free daily newspaper entitled *The Washington D.C. Examiner*.

11.      Defendant The Washington Newspaper Publishing Company, LLC distributes *The Washington D.C. Examiner* Monday through Saturday to homes, on the streets, at Metro Stations, and at other locations in the District of Columbia, Maryland, and Virginia.

12.     I have often observed copies of the *Examiner* being handed out free in Washington, D.C.

13.     Defendant John F. Bisney is a former CNN Radio correspondent and my former colleague at CNN.

14.     In or about June 2005, CNN discharged defendant John F. Bisney in part because of his harassment of me, as more fully described below.

15.     Defendant John F. Bisney is approximately fifty-one (51) years of age.

16.     For the entire time I have known defendant John F. Bisney, he was not married.

17.     I first met defendant John F. Bisney sometime in 1997 while we both worked on the CNN program *Crossfire.*

18.     Beginning in or about November 2002, defendant John F. Bisney and I developed a social friendship.

19.     I ended my friendship with defendant John F. Bisney in May 2005 when I learned that defendant John F. Bisney, without my knowledge or permission, among other things, had obtained access to my electronic mail (hereinafter referred to as "e-mail") and read them and had established and maintained websites on the World Wide Web my name, and posted personal and private information regarding and photographs of me thereon, all as alleged more fully below.

20.     During the period of my friendship with defendant John F. Bisney from November 2002 to May 2005, I from time to time attended concerts, went out to dinner, and took vacations with defendant John F. Bisney.

21.     When Defendant John F. Bisney and I traveled together, we always stayed in separate hotel rooms.

22.     Also during the period of my friendship with defendant John F. Bisney from November 2002 to May 2005, I accepted gifts from defendant John F. Bisney as I would from any other person whom I considered a friend.

23.     At no time ever have I had any type of romantic relationship with defendant John F. Bisney.

24.     At no time ever have I had any type of sexual relationship with defendant John F. Bisney.

25.     At no time ever have I had any type of relationship with defendant John F. Bisney other than one of friendship.

26.     I have never kissed defendant John F. Bisney romantically.

27.     I have never engaged in sexual intercourse with defendant John F. Bisney.

28.     I have never engaged in sexual or genital touching with defendant John F. Bisney.

29.     I have never engaged in any behavior with defendant John F. Bisney that could be said to denote a romantic or sexual relationship of any kind.

30.     I suffer from epilepsy, a disorder that I in part control with medication.

31.     I also suffer from frequent migraine headaches, a condition I in part control with medication.

32.     At all times material to the allegations of the Complaint in this case, I have been under the regular care of a physician for my epilepsy, migraines, and related problems.

33.     Stress exacerbates the epilepsy and the migraines suffered by me by, among other things, causing me to suffer seizures, severe and debilitating headaches, nausea, and other symptoms.

34.     I suffered from this disorder of epilepsy, migraines, and related problems and when I first met defendant John F. Bisney in 1997.

35.     In or about 2002, I told defendant John F. Bisney that I suffered from epilepsy, migraines, and related problems.

36.     In or about 2002, I told defendant John F. Bisney that stress exacerbated the epilepsy, migraines, and related problems, suffered by me by, among other things, causing me to pass out and to suffer seizures, severe and debilitating headaches, nausea, and other symptoms.

37.     In or about 2002, I told defendant John F. Bisney that I took medication to control my epilepsy, migraines, and related problems.

38.     In or about 2002, I told defendant John F. Bisney that I was under the regular care of a physician for epilepsy, migraines, and related problems.

39.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer seizures.

40.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer severe and debilitating headaches.

41.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer nausea.

42.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me suffer migraine headaches.

43.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me pass out.

44.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me in the hospital for treatment of my epilepsy, migraines, and related symptoms.

45.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me take medication for my epilepsy, migraines, and related problems.

46.     From time to time throughout the period that I maintained a friendship with defendant John F. Bisney, defendant John F. Bisney observed me visit a physician for treatment of my epilepsy, migraines, and related problems.

47.     Throughout the period of my friendship with defendant John F. Bisney, I repeatedly told defendant John F. Bisney in unequivocal language that I was not interested in a romantic or sexual relationship of any type with him.

48.     Throughout the period of my friendship with defendant John F. Bisney, I repeatedly told defendant John F. Bisney in unequivocal language that I was not interested in dating him.

49.     Throughout the period of my friendship with defendant John F. Bisney, I repeatedly told defendant John F. Bisney in unequivocal language that I was only interested in being his friend.

50.     From time to time during the period of my friendship with defendant John F. Bisney, I discussed with defendant John F. Bisney the fact that my income and assets were inadequate to pay my expenses.

51.     On numerous occasions, defendant John F. Bisney offered to provide money to me to help me pay my expenses.

52.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had extensive inherited wealth.

53.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had numerous lucrative investments.

54.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had sizeable discretionary income.

55.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he did not need to work because he had sufficient money to live without working.

56.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he had no children, family, or dependents who depended upon him for assistance or support.

57.     When defendant John F. Bisney offered to provide money to me as alleged herein and on numerous other occasions, defendant John F. Bisney stressed to me that he did not expect me to pay back any of the money he provided me.  On the basis of these representations, I accepted money from time to time from defendant John F. Bisney as a gift.

58.     Throughout the friendship between defendant John F. Bisney and me, defendant John F. Bisney expressed his desire to have a romantic and sexual relationship with me.

59.     On each occasion when defendant John F. Bisney expressed this desire, I told him that I was not interested in any such relationship with defendant John F. Bisney.

60.     In or about March 2004, I discovered that defendant John F. Bisney had accessed my e-mail and read hundreds of e-mail messages stored therein.

61.     At no time did I ever authorize defendant John F. Bisney to access my e-mail for any reason.

62.     At not time did I ever authorize defendant John F. Bisney to read e-mails stored in my e-mail account.

63.     In late 2004, defendant John F. Bisney increased his pressure on me to have a romantic and sexual relationship with him.

64.     In response to this pressure, I repeatedly told defendant John F. Bisney that I did not want a romantic or sexual relationship with him and would not engage in one and that if he persisted in pressuring me, I would break off my friendship with him.

65.     When so rebuffed by me, defendant John F. Bisney changed his story and told me that the money he had given me had not been a gift but a loan and demanded immediate repayment.

66.     At or about this same time in late 2004, defendant John F. Bisney sent me an e-mail containing an "article" authored by defendant John F. Bisney stating that I sought friendships with wealthy men for the purpose of procuring money from them.  Defendant John F. Bisney threatened to send this "article" to *The Washingtonian* magazine if I did not do what he demanded.  A complete and accurate photocopy of this e-mail message is attached to the Complaint in this case as Exhibit 1 and is incorporated herein by reference.

67. This fake "article" in the e-mail message from defendant John F. Bisney, Exhibit 1, named the following persons as having been targets of my procurement activities: Gary Williams, the basketball coach at the University of Maryland; Mark Ein, identified in the message as a "venture capitalist;" Julian Esptein, identified in the message as a "Democratic superlawyer;" United States Representative Pete Sessions; Paul Bosserman, identified in the message as "Georgetown hairdresser to the stars;" John Sunnunu, Sr., former chief of staff to President George H.W. Bush; John Daggitt, identified in the message as a "multi-millionaire," and whom I was allegedly engaged to; and defendant John F. Bisney, described in the message as "a recent paramour" of mine.

68. Of all the men named in this fake article, Exhibit 1, I had briefly dated only Gary Williams, Paul Bosserman, Julian Epstein (over ten years before), and John Daggitt (five years before).

69. I had never in any way dated or been romantically or sexually involved with any of the other men named in this fake article, Exhibit 1.

70. At no time did I ever seek the friendship of any of these men or of anyone else for the purpose of seeking money from them.

71. In or about May 2005, my father, James C. Benz, told me that by chance he had found two (2) Internet sites, www.kathy-benz.net and www.kathy-benz.com.

72. I had not established any such Internet sites.

73. I had never authorized anyone to establish any such Internet sites.

74. The first that I ever heard of these Internet sites was when my father told me of their existence.

75.     Upon learning of the existence of these two (2) Internet sites, I viewed them on the World Wide Web.

76.     Each of these two (2) Internet websites linked to other websites that dealt with negative character traits, such as narcissism, self-importance, arrogance, and haughtiness.

77.     On or about May 9, 2005, I communicated with employees of the Internet host for these two (2) websites, GoDaddy.com.

78.     Employees of GoDaddy.com informed me that defendant John F. Bisney had established the two (2) Internet sites.

79.     On or about May 9, 2005, I told defendant John F. Bisney what I had learned from GoDaddy.com about him having established the two (2) Internet sites.

80.     In reply, defendant John F. Bisney denied that he had any involvement with establishing those two (2) Internet websites.

81.     I then sent an e-mail message to defendant John F. Bisney telling him not to communicate with me in any way.

82.     Defendant John F. Bisney replied admitting to me that he had in fact been responsible for establishing the two (2) Internet sites and that he had lied when he denied responsibility for doing so.

83.     At some point thereafter, I was no longer able to access these Internet websites.

84.     On or about May 16, 2005, while covering a press conference for my employer, CNN, I noticed defendant John F. Bisney pacing back and forth behind me and staring at me in a hostile and intense way, causing me to feel uncomfortable, scared, and fearful for my safety.

85.     Also on May 16, 2005, some two (2) hours after this press conference, defendant John F. Bisney e-mailed me and commented on my physical appearance at the press conference.

86.     On or about May 17, 2005, I learned of the existence of a third Internet website about me on the World Wide Web, www.kathy-benz.org.

87.     I had not created the third Internet website, www.kathy-benz.org.

88.     I had not authorized anyone to create the third Internet website, www.kathy-benz.org.

89.     On or about May 14, 2005, I viewed the third Internet website, www.kathybenz.org.

90.     On this third Internet website, www.kathy-benz.org, I found a page headed "Looks are deceiving.  Boys Do you know anyone like this?'  This heading was followed by several statements listing unpleasant character traits, for example:  "[f]eels grandiose and self-important;" "obsessed with fantasies;" "uses others to achieve her own ends;" "devoid of empathy;" and "behaves arrogantly and haughtily."

91.     After I located this third Internet Website, www.kathy-benz.org, I communicated with employees of GoDaddy.com, the host for this third Internet website.

92.     The employees of GoDaddy.com informed me that this third Internet website, www.kath-ybenz.org, had been established by defendant John F. Bisney.

93.     After learning that defendant John F. Bisney was behind this third Internet website, www.kathy-benz.org, I communicated with friends of defendant John F. Bisney and told them what I had discovered about this third Internet website and that I wanted them to persuade defendant John F. Bisney to take this third Internet website down.

94.    After I communicated with the friends of defendant John F. Bisney, I again checked and found that this third Internet website remained active.

95.    After I communicated with the friends of defendant John F. Bisney, I discovered that defendant John F. Bisney had added to the third Internet website, www.kathy-benz.org, photographs of me wearing only a bikini taken by defendant John F. Bisney while on vacation with me.

96.    Attached to the Complaint in this case as Exhibit 2 and incorporated herein are several pages downloaded from www.kathy-benz.org.

97.    I had never known of the existence of any of these Internet sites before my father called to tell me about them.

98.    At no time did I ever authorize anyone to establish an Internet site in or in any way using my name.

99.    At no time did I ever authorize anyone to post on any Internet site any personal information about me.

100.    At no time did I ever authorize anyone to post on any Internet site any photographs of me.

101.    By no later than May 10, 2005, I had on several occasions instructed defendant John F. Bisney not to communicate with me in any way.

102.    By no later than May 10, 2005, I had instructed defendant John F. Bisney not to come near me.

103.    On or about May 21, 2005, I instructed the security service in my building not to permit defendant John F. Bisney to enter.

104.    On or about May 25, 2005, defendant John F. Bisney entered the apartment building where I reside and slipped a card under my apartment door.

105.    On or about June 1, 2005, I brought a civil action in the Superior Court of the District of Columbia styled *Benz v. Bisney*, Case No. CA-05-4205 (hereinafter referred to as "the D.C. Superior Court Case").  A complete and accurate photocopy of the Complaint that I filed in the D.C. Superior Court Case is attached to the Complaint in this case as Exhibit 3 and is incorporated herein by reference.

106.    Along with my Complaint, I filed Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction requesting the Superior Court of the District of Columbia to enjoin defendant John F. Bisney from communicating with me in any way and from creating or maintaining any websites referring to me.

107.    On June 8, 2005, Judge Henry F. Greene of the Superior Court of the District of Columbia, signed a Temporary Restraining Order enjoining defendant John F. Bisney "from creating or maintaining, directly or through a third party, any Internet website referring in any way to plaintiff" and providing that defendant John F. Bisney could not "'blog' or participate in any Internet chat rooms regarding plaintiff."  A complete and accurate photocopy of that Temporary Restraining Order is attached to the Complaint in this case as Exhibit 4 and is incorporated herein by reference.

108.    On July 11, 2005, defendant John F. Bisney and I executed a document entitled "Binding Settlement Agreement and Release" regarding the D.C. Superior Court Case (hereinafter referred to as "the D.C. Superior Court Case Settlement Agreement").  A complete and accurate photocopy of the Binding Settlement Agreement and Release is attached to the Complaint in this case as Exhibit 5 and is incorporated herein by reference.

109.    Paragraph 2 of the D.C. Superior Court Case Settlement Agreement provides that "[t]he parties agree that they will not intentionally contact or communicate with each other."

110.    Notwithstanding the pendency of the D.C. Superior Court Case and his execution of the D.C. Superior Court Case Settlement Agreement, from in or about July 2005 and continuing through the date of the Complaint in this case defendant John F. Bisney has engaged in a campaign of harassment, identity-theft, Internet stalking, and defamation to destroy my health, reputation, and well-being..

111.    For example, defendant John F. Bisney on or about July 19, 2005, wrote a second fake news article, this one entitled "Politics And Porn Stars."  This second fake news article was very close in content to the initial fake news article attached to the Complaint in this case as Exhibit 1.  A complete and accurate photocopy of this second fake news article is attached to the Complaint in this case as part of Exhibit 6 and is incorporated herein by reference.

112.    In this second fake news article, Exhibit 6, defendant John F. Bisney states that I am dating Mark Kulkis, president and CEO of Kick Ass Pictures, a company that produces pornographic movies; that I am a "Washington powerdater;" that I told my girlfriends "Mark's a wonderful guy and I think this could be the real thing;" and that I am "known in Washington power circles" for dating numerous men, identifying them by name as:  Jonathan Ledecky, a "venture capitalist;" Gary Williams; and Mel Karmazin, CEO of Sirius,  with whom the article alleged that I had "spent time last August … at his Hamptons home."

113.    I never dated or had any romantic or sexual involvement of any type with Mark Kulkis, Jonathan Ledecky, or Mel Karmazin and indeed, did not and do not even

know Mel Karmazin and have never visited the home of Mel Karmazin in the Hamptons or anywhere else.

114.    Defendant John F. Bisney sent this second fake article, Exhibit 6, all around the World Wide Web by posting it on numerous Internet sites, many of them containing explicit sexual material, such as "SXXXY.org," "Scuttleslut.blogspot.com," "PornNews.com," "Submittodesire.tripod.com," and numerous other sites.

115.    In or about July 31, 2005, defendant John F. Bisney modified the fake article, Exhibit 6, by adding additional men with whom I had romantic involvement, specifically Representative Pete Sessions, John Sunnunu, Sr., and Mark Ein.  A complete and accurate of this further-modified fake article is attached to the Complaint in this case as part of Exhibit 6 and is incorporated herein by reference.

116.    I never had any romantic or sexual involvement of any type, and never dated, Sessions, Sunnunu, or Ein.

117.    In other postings on the World Wide Web, defendant John F. Bisney added the names of John McDonough, identified by defendant John F. Bisney as a "Chicago Cubs VP," and Julian Esptein.

118.    I do not know any person employed by or affiliated with the Chicago Cubs, including any "John McDonough."

119.    Defendant John F. Bisney posted similar versions of the articles contained in Exhibit 6 on several other websites, including www.dailysexreview.com.  In his posting on this website, defendant John F. Bisney alleges I am dating Mark Kulkis and writes: "Finally, a relationship in which Kulkis isn't the sluttier one.  Happy herpes!"  A complete and

accurate photocopy of this posting, as printed from the World Wide Web, is attached to the Complaint in this case as Exhibit 7 and is incorporated herein by reference.

120.    I am not and have never been a "slut."

121.    Defendant John F. Bisney has distributed the fake article linking me with Kulkis with a photograph of me juxtaposed to a photograph of Kulkis.

122.    One Internet website to which defendant John F. Bisney distributed the fake article linking me with Kulkis and containing photographs of me and Kulkis is bc.indymedia.org.  A complete and accurate photocopy of the fake article as downloaded from that Internet website is attached to the Complaint in this case as Exhibit 8 and is incorporated herein by reference.

123.    I have a professional acquaintance with John McDonough, an agent of the United States Secret Service.

124.    I have never had any type of sexual or romantic relationship and have never dated Secret Service Agent John McDonough.

125.    I referred to Secret Service Agent John McDonough in conversations in front of defendant John F. Bisney.

126.    On or about May 13, 2005, at 12:31 a.m. E.D.T., defendant John F. Bisney sent an e-mail message to me that said (among other things):  "Hey you said you're not a baseball fan but you never mentioned JD."  A complete and accurate photocopy of this e-mail message is attached to the Complaint as Exhibit 9 and is incorporated herein by reference.

127.    On or about May 13, 2005, at 6:16 a.m. E.D.T., defendant John F. Bisney sent me an e-mail message, with a subject line that sated "Correction."  This e-mail

stated: "McDonough (not 'JD')." A complete and accurate photocopy of this e-mail message is attached to the Complaint in this case as Exhibit 10 and is incorporated herein by reference.

128.    I do know Craig Karmazin, the son of Mel Karmazin, though I have never had any type of sexual or romantic relationship with Craig Karmazin and have never dated him.

129.    On an occasion in 2005, defendant John F. Bisney was present and within hearing distance while I spoke on the telephone with Mel Karmazin's son, Craig.

130.    After overhearing the part of this conversation conducted by me, defendant John F. Bisney became agitated and hostile and accused me of having a romantic and sexual relationship with Mel Karmazin who, defendant John F. Bisney told her, had once fired defendant John F. Bisney from a radio job. I told him that I did not even know Mel Karmazin, but he broke down crying.

131.    CNN assigned me to produce and cover a press conference being held June 14, 2005, by Mary Carey, a pornographic movie star who had come to Washington, D.C., with Mark Kulkis, a producer of pornographic films. This was the extent of my relationship with Mark Kulkis.

132.    CNN and numerous other broadcasters broadcast the press conference held by Mary Carey and anyone watching could have seen that I was covering this press conference for CNN.

133.    Attached to the Complaint in this case as Exhibit 11 are photocopies of sixteen (16) of the hundreds of articles on various websites on the World Wide Web containing the various versions of the fake news story published by defendant John F. Bisney about me.

134.    Among the websites to which defendant John F. Bisney has sent the fake news articles is one entitled WhatshappeningatCNN.blogspot.com, a website about events of interest to employees of CNN.  A high percentage of CNN employees read this website.

135.    On July 21, 2005, a version of the fake news article published by defendant John F. Bisney about me this one entitled "Porn Baron + CNN Producer," appeared on the website WhatshappeningatCNN.blogspot.com, where it remains available to this date.  A complete and accurate photocopy of this version of the fake news article is attached to the Complaint in this case as Exhibit 12 and is incorporated herein by reference.

136.    Since in or about July 2005, defendant John F. Bisney has sent e-mail messages to members of my family, directing them to pornographic websites where the fake articles about me are available.

137.    I have had involvement as a volunteer with a charity known as "Hoop Dreams," which provides college scholarships to the youth of the District of Columbia, college and career mentoring, SAT preparation, internships and job connections, and community service.

138.    The chair of the board of Hoop Dreams is Susan Kay.

139.    In or about August 2005, defendant John F. Bisney sent a fake e-mail message in the name of Susan Kay to some members of the board of directors of Hoop Dreams directing those directors to the fake news articles about me.

140.    Susan Kay did not authorize or send the e-mail message that defendant John F. Bisney sent out in my name.

141.    On or about August 22, 2005, defendant John F. Bisney sent a fake e-mail message to me purporting to be from my superior at CNN, Phil Kent.  A complete and

accurate photocopy of that e-mail message is attached to the Complaint in this case as Exhibit 13 and is incorporated herein by reference.

142.    In Exhibit 13, defendant John F. Bisney stated:  "I would strongly warn you to maintain better boundaries between your life and your employment.  This is critical to maintain the professional integrity of our product."

143.    On or about July 31, 2005, at approximately 3:01 a.m. defendant John F. Bisney sent a fake e-mail message from Dr. Sanjay Gupta, Medical Correspondent for CNN, to me forwarding an article entitled "U.S. Warns Fentanyl Patients About Drug."  I sent an e-mail message to Dr. Gupta asking about this purported message.  Dr. Gupta denied sending the e-mail message or having any knowledge about the message.  Complete and accurate photocopies of these e-mail messages are attached to the Complaint in this case as Exhibit 14 and are incorporated herein by reference.

144.    Since on or about August 25, 2005, defendant John F. Bisney has impersonated me by replying in my name with my home telephone number, my personal work telephone number, my home address, and my e-mail address to personal advertisements seeking sexual relations that were posted on a website known as www.craigslist.com.

145.    As a result of this impersonation of me by defendant John F. Bisney, persons who have posted personal advertisements seeking sexual relations on a website known as www.craigslist.com, have communicated with me in numerous telephone calls and e-mail messages from persons who believe I desires to engage in sexual relations with them.

146.    I have never responded to any personal ads on www.craigslist.com.

147.    Attached to the Complaint in this case as Exhibit 15 and is incorporated herein by reference are complete and accurate photocopy of some of fake responses posted by

defendant John F. Bisney at www.craigslist.com impersonating me with the phone numbers and addresses of plaintiff, Kathleen A. Benz.

148.    The e-mails and telephone calls contain graphic sexual content and have severely upset me.

149.    I fear for my safety, knowing that persons who are seeking sexual relations and who believe I am also seeking sexual relations have been provided my home and work telephone numbers, my home address, and my e-mail address by defendant John F. Bisney.

150.    On or about August 26, 2005, defendant John F. Bisney sent an e-mail message to a weblog that addresses matters relating to Texas politics.  A complete and accurate photocopy of this e-mail message is attached to the Complaint in this case as Exhibit 16 and is incorporated herein by reference.

151.    In this message, Exhibit 15, defendant John F. Bisney stated that I was having an affair with Representative Pete Sessions, who is married.

152.    In this message, Exhibit 15, defendant John F. Bisney also stated that I have a romantic and sexual relationship with one Kinky Friedman, a Texas author and politician.

153.    As noted, I have never had any type of romantic or sexual relationship with Rep. Sessions, nor have I ever dated him.

154.    I have never had any type of sexual or romantic relationship, and have never dated, Kinky Friedman.

155.    On or about August 19, 2005, defendant The Washington Newspaper Publishing Company, LLC published in its print publication, *The Washington D.C. Examiner*,

an article under the byline of one Karen Feld, entitled "Controversial Love for CNN Producer," (hereinafter referred to as "the *Examiner* Article"). A complete and accurate photocopy of the *Examiner* Article as it appeared in the print edition of *The Washington D.C. Examiner* is attached to the Complaint in this case as Exhibit 17 and is incorporated herein by reference.

156.    Defendant The Washington Newspaper Publishing Company, LLC posted the *Examiner* Article on *The Washington Examiner*'s website at www.dcexaminer.com, where, as of the date of the filing of the Complaint in this case, it remains available to members of the public with Internet access. A complete and accurate photocopy of the *Examiner* Article as it was downloaded from the website of *The Washington Examiner* is attached to the Complaint in this case as Exhibit 18 and is incorporated herein by reference.

157.    Prior to publishing the *Examiner* Article in print and on its website, defendant The Washington Newspaper Publishing Group, LLC did not speak or attempt to speak with me.

158.    It was the *Examiner* Article that defendant John F. Bisney sent to the members of the board of directors of the Hoop Dreams foundation, as alleged above.

159.    On or about August 19, 2005, I telephoned Karen Feld, the person whose byline appeared on the *Examiner* Article.

160.    Karen Feld refused to take my August 19, 2005, telephone call.

161.    On at least three (3) more occasions August 19, 2005, I telephoned Karen Feld.

162.    Karen Feld refused to take any of my telephone calls August 19, 2005.

163.    When Karen Feld refused to take my telephone calls, I left a message asking Karen Feld to call back.

164.    Karen Feld failed to return any of my numerous telephone calls August 19, 2005.

165.    The next day, on or about August 20, 2005, I succeeded in reaching Karen Feld by telephone by pretending to be a social friend of Karen Feld.

166.    In that telephone call, I told Karen Feld that the *Examiner* Article was substantially false.

167.    In that telephone call, I also demanded that the *Examiner* print a retraction.

168.    In reply, Karen Feld told me that the *Examiner* would not print a retraction.

169.    Further in reply, Karen Feld told me to "just get used" to such stories.

170.    I have never suffered from this type of harassment, defamation, annoyance, and intimidation from anyone else.

171.    I cannot conceive of anyone who would subject me to this other than defendant John F. Bisney.

172.    Other than defendant John F. Bisney, no one I have ever known has ever engaged in the activities set forth above with regard to me or anyone else I know, or so much has threatened to do so.

173.    As a result of what I have been through in the past two (2) months, I have suffered a worsening of my symptoms. This includes headaches, seizures, nausea, extreme anxiety, and utter despair that my reputation is being ruined in this way.

174.    I am a private person and it causes me deep anguish and embarrassment to have my life exposed on the Internet as it has been.

175.    It is especially troublesome to me that defendant John F. Bisney has directed his false and scurrilous statements about me to my family and to my colleagues at CNN.

**THIS ENDS MY DECLARATION.**

First Decln KB.doc

I declare under penalty of perjury that the foregoing is true and correct. Executed

on

August 31, 2005.

28 U.S.C. § 1746(2)

_____

Kathleen A. Benz