IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHLEEN A. BENZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:05CV01760 EGS |
| | ) |
| THE WASHINGTON NEWSPAPER | ) |
| PUBLISHING COMPANY, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF,
KATHLEEN A. BENZ, IN OPPOSITION TO DEFENDANT
THE WASHINGTON EXAMINER'S MOTION TO DISMISS**

The meaning of the Yiddish word "chutzpah" used to be illustrated by the man accused of killing his parents who threw himself on the mercy of the court as an orphan. This case gives it new meaning. Here, the defendant published a false story stating that the plaintiff, a single young woman, had "hooked up"—that is, engaged in sexual activity without emotional attachment—with a notorious producer of pornographic movies and otherwise used her professional position to cultivate romance and sexual liaisons with "power players." When sued for defamation, the defendant claims that such a statements about a young unmarried professional woman in this day and age in Washington, D.C., cannot, as a matter of law, be seen as damaging to the plaintiff's reputation. Now that is "chutzpah."

The plaintiff in this case, Ms. Kathleen A. Benz, a thirty-five (35) year old single woman, works as an assignment editor and producer in the Washington, D.C. office of

the Cable News Network. Ms. Benz has never courted or received publicity. The facts relating to her life do not meet the test to make her a "public figure" within the meaning of First Amendment jurisprudence. To the contrary, Ms. Benz, who suffers from epilepsy and debilitating migraine headaches, has lived a private life, free of publicity or scandal.

The defendants in this case changed all that. One of the two defendants, The Washington Newspaper Publishing Company, LLC (hereinafter referred to as "Publishing Company") on August 19, 2005, published a "gossip column" that accused Ms. Benz (among other things) of having "hooked up" with a notorious producer of pornographic movies, one Mark Kulkis.[1] Now "hooked up" has a meaning in our current culture: it means to engage in sexual intercourse with another person without any emotional attachment to that person. For example, a recent report on the sexual activities of college students stated that the term refers to "a distinctive sex-without-commitment interaction" that "commonly takes place when both participants are drinking or drunk." "Hooking Up, Hanging Out, And Hoping For Mr. Right—College Women On Dating And Mating Today," Independent Woman's Forum, July 26, 2001, at 3. (A photocopy of this article as downloaded from the Internet is attached as Exhibit 1 to this Memorandum).

The problem is, Mr. Benz has never dated Mr. Kulkis, much less "hooked up with him." Her only contact with him was professional: as part of her job for Cable News Network, Ms. Benz produced her network's coverage of a press conference that Kulkis held when he came to Washington, D.C.

---

[1] The other defendant, John Bisney, fabricated similar stories about Ms. Benz and circulated them all over the Internet, even as he (among other things) pretended to be Ms. Benz when he responded in her name to various sexually oriented advertisements on the Internet. Mr. Bisney has also moved to dismiss the Complaint. Ms. Benz has filed a separate opposition to Bisney's motion.

Defendant's article also stated that Ms. Benz used her position at CNN to meet and become romantically and sexually involved with influential, wealthy, and powerful men, persons the defendant called "power players." Ms. Benz has not even met many of these men, and as for the few of them that she in fact had dated, she had never used her job as a method of becoming involved with these men.

And defendant printed all this without so much as asking Ms. Benz for her version of the facts. Defendant never even attempted to obtain Ms. Benz's comment on the story. Nor did defendant conduct even the most basic research on the statements it published: had it done so, it would have discovered that its article cannot stand up to scrutiny.

On September 2, 2005, Ms. Benz filed a five claim Complaint against defendant Publishing Company and defendant John F. Bisney, seeking compensatory and punitive damages and injunctive relief against defendant Publishing Company for defamation, invasion of privacy – public disclosure of private facts, and false light invasion of privacy. Ms. Benz filed a First Amended Complaint October 20, 2005, to add the Correction to her claims against defendant Publishing Company. Defendant Publishing Company has moved to dismiss all the claims against it, Claim One (Defamation), Claim Three (Invasion Of Privacy – Public Disclosure Of Private Facts), and Claim Four (False Light Invasion Of Privacy) of the First Amended Complaint with prejudice under FED. RULE CIV. PRO. 12(b)(6) for failure to state claims upon which relief can be granted.

Measured by the standards governing such motions under federal law, which requires that "a complaint should not be dismissed for failure to state a claim unless it appear *beyond doubt* that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson*, 335 U.S. 41, 45-46 (1957)(emphasis added), this

3

Motion must fail.  Ms. Benz's pleading readily meets the notice pleading requirements of FED. R. CIV. PRO. 8(a).

I.     **THE ARTICLE AND THE CORRECTION**

Defendant Publishing Company publishes *The Washington Examiner*, a free, daily "newspaper" in the Washington, D.C. metropolitan area, including suburbs in Maryland and Virginia.  First Amended Complaint ¶ 10.  Defendant Publishing Company also maintains an Internet site, www.dcexaminer.com, where it posts articles from the print editions of *The Washington Examiner* and where these articles remain available free of charge to anybody with access to the World Wide Web.  *Id.* ¶ 165.

On August 19, 2005, defendant Publishing Company published a defamatory article under the byline of one Karen Feld entitled "Controversial Love For CNN Producer" (hereinafter referred to as "the Article").  *Id*. ¶ 162.  (The print version of the Article is attached to the First Amended Compliant as Exhibit 17.  *Ibid*.)  The Article appeared in Ms. Feld's self-styled "gossip column" entitled "The Buzz."  Defendant also posted an online version of the Article on its Internet site, www.dcexaminer.com.  *Id*. ¶ 165.  (Exhibit 18 to the First Amended Complaint is the Internet version of the Article downloaded and printed out.  *Ibid*.)  (The Internet and print versions of the Article contain identical content.)

Defendant set the tone and tenor of the Article with its title, "Controversial Love For CNN Producer," which occupied the entire first line in the print edition of Ms. Feld's column.  The first sentence of the Article stated that "CNN producer **Kathy Benz**, 35, uses her position to meet all the 'right' people," (boldface type in original), continuing:  "She's been linked romantically with power players – including venture capitalist **Jonathan Ledecky** (a Washington Nationals ownership hopeful), University of Maryland basketball coach **Gary**

4

**Williams**, Chicago Cubs VP **John McDonough**, Sirius CEO **Mel Karmazin**, actor **Hugh O'Brien**, CNN correspondent **John Bisney**, Georgetown hairstylist **Paul Bosserman** and her one-time fiance (*sic*), AOL millionaire **John Daggett**." (Boldface type in original). After thus "romantically linking" each of these men with Ms. Benz, the Article went on to state: "Now, she has hooked up, according to her gal pals, with porn king **Mark Kulkis**. The couple first met when Kulkis, 40, president and CEO of Kick Ass Pictures, did a CNN interview while he was in D.C. for the National Republican Congressional Committee's annual President's Dinner." (Boldface type in original).

After Ms. Benz brought this action, defendant Publishing Company published what it called a "Correction" as part of Karen Feld's column in the September 30, 2005, print and online editions of *The Washington Examiner*. First Amended Complaint ¶ 180. (Exhibit 19 to the First Amended Complaint reproduces the downloaded Internet version of this correction. *Ibid*.) While defendant Publishing Company stated in this correction that Ms. Benz had not dated several of the men listed in the Article to which she was "romantically linked," including Kulkis, the correction went on to repeat the gist of at least part of the original defamatory Article, that is, that Ms. Benz used her position at CNN to obtain romantic relationships with "Gary Williams, Paul Bosserman and John Daggett," each of whom the so-called "Correction" described as "contacts made by Kathy Benz, an assignment editor at CNN.

The "Correction" then issued the familiar Washington, D.C. "non-apology," that is to say, a statement that, while couched in the language of apology, in reality attempts to shift the blame from the publisher of defamatory statements to anyone so hyper-sensitive as to have taken offense. The apology is not for what the defendant said, but for the fact that the subject of the story was offended. Accordingly, rather than apologize for what it had done in

5

printing false statements about Ms. Benz, defendant Publishing Company apologized for *Ms. Benz* having taken offense: it stated, "we … apologize to Ms. Benz for any offense taken" by her.

## II.   FIRST AMENDED COMPLAINT

The First Amended Complaint pleaded that Ms. Benz had never had any type of romantic, love, or sexual relationship with Kulkis and had never "hooked up" with Kulkis, but to the contrary, had only had a professional contact with Kulkis when she produced a press conference for CNN.  First Amended Complaint ¶ 111.  Ms. Benz specifically alleged that she did not even know two of the persons with whom defendant claimed she had been romantically linked, specifically Mel Karmazin and John McDonough.  *Id*. at ¶¶ 111 & 116.  She further alleged that she had no romantic relationship whatsoever with Hugh O'Brien or Jonathan Ledecky or anyone employed by the Chicago Cubs, with all of whom defendant had alleged she had been romantically linked.  *Ibid*.  As to the men she had dated, Gary Williams, Paul Bosserman, and John Daggitt, she alleged that she had in no way used her position to gain access to these men.  *Id*. at ¶ 180.

As to the "Correction," the First Amended Complaint alleged that it repeated, as noted above, part of the gist of the original Article:  that Ms. Benz used her position at CNN to gain access to the affections of powerful, older, and more wealthy men.  *Ibid*.

The First Amended Complaint alleged that the statements published by defendant Publishing Company were false and defamatory, Claim One, in that the article stated that she had engaged in sexual relations without any emotional attachment with Kulkis, a producer of pornographic movies whom she had never dated; that she used her job to obtain romance and sexual relationships with "power players," those being older, wealthy, powerful

6

men; and that she dated persons, older, wealthier, and more powerful, that she did not even know. Claim Three alleged invasion of privacy-public disclosure of private facts and Claim Four alleged false light-invasion of privacy, all on the basis of these same factual allegations.

### III.    MOTION TO DISMISS

Defendant's motion asks the Court to dismiss Claim One (Defamation) for three reasons: (1) the Article and the Correction are not capable of defamatory meaning; (2) the Article and the Correction are not capable of an implied defamatory meaning that Ms. Benz used her position at CNN in an improper manner; and (3) the Article and the Correction do not make an actionable statement of fact as to Ms. Benz's motives. Defendant asks the Court to dismiss Claim Four (False Light Invasion Of Privacy) because Ms. Benz was not placed in a highly offensive light. Finally, defendant asks the Court to dismiss Claim Three (Public Disclosure Of Private Facts) of the First Amended Complaint because Ms. Benz has not pleaded that defendant disclosed any "private facts" and that the disclosures were not "highly offensive" to a reasonable person.

Under FED. RULE CIV. PRO. 12(b)(6), "a complaint should not be dismissed for failure to support a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). This "straight-forward principle enunciated by the Supreme Court in Conley has been reaffirmed and applied in numerous cases in every quadrant of the federal judicial system." 5B C. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 1357, at 571 (2004) (hereinafter referred to as "WRIGHT & MILLER").

Defendant Publishing Company, citing an out-of-date edition of WRIGHT & MILLER (the supplanted Second Edition) and cases decided at the summary judgment stage,

7

claims that courts are more inclined to grant 12(b)(6) motions to dismiss when the claims asserted are ones that are traditionally disfavored, such as defamation claims. *Memorandum Of Points And Authorities In Support Of Defendant The Washington Examiner's Motion To Dismiss* (hereinafter referred to as "*Defendant's Memorandum*"), at 6.

The current (Third) edition of WRIGHT & MILLER, however, states that two recent decisions of the Supreme Court have "cast in serious doubt" the "notion that a federal court can use a stricter pleading standard on a motion dismiss a disfavored action." 5B Wright & Miller § 1357, at 732-733. Indeed, that notion, WRIGHT & MILLER notes, "may well have been rendered invalid" by these cases, citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) and *Swierkiewicz v. Sorema N.A.*. 534 U.S. 506 (2002). In *Leatherman*, the Supreme Court rejected the Fifth Circuit's imposition of a heightened pleading requirement in a case brought under 42 U.S.C. § 1983, citing FED. RULE CIV. PRO. 8(a)(2)'s requirement that a pleading "include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Leatherman*, 507 U.S. at 168. In *Swierkiewicz*, the Court reversed the Second Circuit's imposition of a heightened pleading requirement in employment discrimination cases. *Swierkiewicz*, 534 U.S. at 512-513, reaffirming that RULE 8(a)(2)'s "short and plain statement" standard governs. As WRIGHT & MILLER observed, "in both cases the Court makes it clear that Rule 8 announces a pleading standard that is applicable to *all* cases." 5B Wright & Miller § 1357, at 732. The only exceptions to this, WRIGHT & MILLER noted, are cases "governed by Rule 9(b) or a heightened pleading requirement in a federal statute." *Ibid*. Those exceptions have no relevance to this case. (In this diversity case, it bears emphasis that D.C. Courts have not adopted a heightened

standard for pleading in defamation cases. *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172 (D.C. 1997).)

The test here, then, is whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief" under the law of the District of Columbia governing her substantive claims. *Conley, supra,* 355 U.S. at 45-46. Under the familiar RULE 12(b)(6) standards, this Court must view the facts presented in the pleadings and all inferences drawn therefrom in a light most favorable to Ms. Benz. *Edwards v. City of Goldsboro*, 178 F.3d 231, 248 (C.A.4 1999). In this analysis, "all of the well pleaded factual allegations in the [Complaint] are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." 5C WRIGHT & MILLER § 1368, at 230; *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (C.A.4 1993).

Under FED. RULE CIV. PRO. 8(f), "[a]ll pleadings shall be so construed as to do substantial justice." "A complaint is generally sufficient so long as it … provides 'adequate notice' to the defendant regarding the essential elements of the plaintiff's claim." *Smith-Berch, Inc. v. Baltimore County, Maryland*, 68 F.Supp.2d 602, 625-626 (D.Md. 1999). Measured by these standards, Claims One, Three, and Four each "state a legally cognizable claim for relief" under District of Columbia law.

## IV.   DEFAMATION

To state a claim for defamation under District Of Columbia law, a plaintiff must allege four elements: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement was at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm

or that its publication caused the plaintiff special harm." *Crowley v. North Am. Telecomms. Ass'n, supra,* 691 A.2d at 1173 n.2 (D.C. 1997).  Under District law, "a publication is defamatory 'if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'"  *Howard University v. Best*, 484 A.2d 958, 988 (D.C. 1984).  "The trial judge has the responsibility to determine whether the statements in question are capable of carrying a defamatory meaning."  *Id*. at 989.  When this determination is made, "the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it was addressed."  *Ibid*.  Accordingly:

> "*only* when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in a defamatory sense, can it rule as a matter of law that it was not libelous."  *Ibid.* (emphasis added).

When the Article is read as a whole and the words are given their ordinary meaning, it cannot be said as a matter of law that the Article is not reasonably capable of any defamatory meaning and cannot reasonably be understood in a defamatory sense.  In the first place, the Article states that Ms. Benz has "hooked up" with Mark Kulkis, a "porn king." That phrase, "hooked up," has a definite meaning:  it means to engage in sexual intercourse with another person without any emotional attachment to that person, that is, to engage in casual sex.  For example, a recent report on the sexual activities of college students stated that the term refers to "a distinctive sex-without-commitment interaction" that "commonly takes place when both participants are drinking or drunk."  "Hooking Up, Hanging Out, And Hoping For Mr. Right—College Women On Dating And Mating Today," Independent Woman's Forum, July 26, 2001, at 3.  (A photocopy of this article as downloaded from the Internet is attached as Exhibit 1 to this Memorandum).

10

The Internet offers ample evidence of the meaning of this term. At www.urbandictionary.com, for example, there appear several definitions of "hook up" taken from various sources from 2003 through 2005, including "to have sex with someone," "to engage in any type of sexual activity," and this definition: "To have sex with someone you are not currently dating or are in a commitment type of relationship with. This may occur when going on a date or on any random occasion." (A photocopy of the download of the definitions for "hook up" from this website is attached to his Memorandum as Exhibit 2.) At amazon.com, there currently appears an advertisement for a book entitled "The Happy Hook-Up: A Single Girl's Guide To Casual Sex." The book review posted by amazon.com states that in "The Happy Hook-Up," "two 30-something women who have done hard time in the casual sex scene address the various issues that women face before, during, and after hooking up." The review further states: "Mindless fling, harmless hook-up, booty call, friends with benefits. Call it what you want, but let's be honest: more females than ever are choosing to stay single—and sleeping around has become an accepted, if not expected, part of the singles scene." The comments appended to the review make it clear that "hook-up" is widely understood to refer to casual sex. For example, one comment refers to the book portraying women who "hook up" "as easy and shall we say, as slutty as possible with no commitments, strings, promises or hard work attached. (A photocopy of the downloaded advertisement for and review of "The Happy Hook-Up," as well as of the comments, is attached to this Memorandum as Exhibit 3.) In the same vein is the article from www.knockonwoody.com, entitled "So, did you hook-up?" In that article, the author stated that "condoms in hand, I went exploring into the enigma of 'hooking-up.'" The author noted that if his "boss told [him] to *hook up with her later*," he

11

would "be quick to respond, … *Should I even bother wearing pants to work?*"  (A photocopy of the download of this article is attached to this Memorandum as Exhibit 4.)

There can be no doubt that by stating that Ms. Benz had "hooked-up" with Kulkis, defendant Publishing Company made a statement about Ms. Benz that "tends to injure plaintiff in [her] trade, profession or community, or lower [her] in the estimation of the community."  *Howard University v. Best, supra,* 484 A.2d at 988.  Indeed, this statement constitutes the type of allegation of "serious sexual misconduct" that the RESTATEMENT (SECOND) OF TORTS § 574 found had traditionally supported the imposition of liability without proof of special damages.  "Serious sexual misconduct," the RESTATEMENT  noted, "has been generally applied to any statement that imputes any form of unchastity to a woman, married or single, irrespective of whether the conduct charged constitutes a criminal offense."  *Id*. Comment:   *b.*, at 196.

> "The rule applies to a statement charging a woman with specific acts of adultery, fornication or any other form of sexual intercourse with a man other than her husband, as well as to general chares of unchaste conduct."  *Ibid*.

The Article did more.  It characterized Kulkis as a "porn king," that is, a person involved at a high level in the production and distribution of movies portraying hard-core sexual activity.  This in itself tends to lower the estimation of Ms. Benz in the community, as many view pornography as a loathsome business that exploits women, degrades the relationship between the sexes, causes damage to those who buy it, and provides money to organized crime.  By stating that Ms. Benz has used her position at CNN to obtain casual sex with a person in this business certainly defamed her.  Defendant conceded as much by titling its Article, "Controversial Love For CNN Producer."

In addition, the Article stated that Ms. Benz's "hooking-up" with Kulkis was part of a pattern whereby she "used her position at CNN" to meet "power players," that is, older, wealthy, powerful and prominent men. The Article, with its listing of Kulkis as among this group, stated that Ms. Benz did so for the purposes of having casual sex with these men, as well as for the purposes of furthering her career. This, too, conveyed a meaning of unchaste conduct by Ms. Benz. Moreover, it also falls within another category recognized by the RESTATEMENT as permitting recovery without proof of actual damages, that of defamatory remarks about one's profession, business, or trade. As the RESTATEMENT noted, publications that "disparage the other in the pursuit of [her] business, trade, [or] profession" or that "tend to harm [her] in it" have been treated at actionable without proof of special damages. RESTATEMENT (SECOND) OF TORTS § 573, Comment: *c*, at 192-193.

Defendant pays lip service to the requirement that the Article be analyzed in its entirety, then proceeds to examine each separate in isolation. For example, defendant argues that the article does not more than say Ms. Benz has been involved in "love affairs." The Article did no such thing: it accused Ms. Benz of sexual misconduct and of using her job as a way to meet me with whom she could have casual sex.

Defendant goes so far as to offer the argument that, even assuming the Article did allege that "Plaintiff engaged in sexual intercourse with a man with whom she was romantically involved, such an allegation of sex between two consenting adults in 2005 in the major metropolitan area of Washington, D.C. cannot be considered so egregious as to make on of those consenting adults appear 'odious, infamous, or ridiculous.'" *Defendant's Memorandum*, at 9. Leaving aside whether such a statement might be actionable, that is not

13

what the Article here said. Indeed, that characterization bears no resemblance to the Article at issue in this case.

Equally fatuous is defendant's argument that there is nothing defamatory about stating that Ms. Benz has "hooked-up" with a "porn king." Of course, the word "Controversial" in the title of the Article undercuts this argument. But in any case, it cannot be said at a matte of law that a statement that a young, unmarried woman is having casual sex with a producer of pornographic movies is not defamatory. Nor does the fact that Kulkis went to the White House or that some celebrity marriages have occurred between journalists and sources have any relevance to this case at this stage. The question at this stage is whether, as a matter of law, the Article cannot be said to be capable of conveying a defamatory meaning.

Defendant also argues that the Article contained only statements of opinion, or that it appeared in such a questionable place—a gossip column—that no one would take it for anything other than opinion. As for opinion, the Article does not offer any. It states as a fact that Ms. Benz is having casual sex with Kulkis, and goes so far as to cite her "gal pals" as confirming sources. Those "gal pals" never confirmed any such thing. What is more, defendant never bothered to check with them about anything. It states as a fact she uses her job to meet men with whom she has sexual and romantic liaisons, and names a number of them. There is no basis to conclude, as a matter of law, that this Article contained only opinion.

Nor does the fact the Article appeared in a gossip column insulate it from attack, as a matter of law. This case bears no resemblance to the cases cited by defendant—most of which are actual malice cases involving public figures—where the parties use hyperbole or opinion columns to argue about important matters of public policy in the media. In the circumstances here, the defendant's motion to dismiss must fail.

The defendant published outrageous statements about Ms. Benz, not least of which was that she was having casual sexual relations with a producer of pornographic films. Here, the Court cannot say as a matter of law "that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in a defamatory sense." For that reason, Claim One states a claim upon which relief can be granted against defendant Publishing Company.

## V. FALSE LIGHT INVASION OF PRIVACY

Defendant seeks to dismissal of Ms. Benz's false light invasion of privacy claim because the alleged defamatory statements in the Article do not accuse Ms. Benz of "repugnant conduct" or were "highly offensive." *Defendant's Memorandum*, at 18. District of Columbia courts have adopted the elements of a claim for false light invasion of privacy found in the RESTATEMENT (SECOND) OF TORTS § 652 E. *Vassiliades v. Garfinckel's*, 492 A.2d 580, 587 (D.C. 1985). A plaintiff must show four elements to prove a false light invasion of privacy claim: (1) publicity, (2) about a false statement, representation or imputation, (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a light that would be offensive to a reasonable person. RESTATEMENT (SECOND) OF TORTS § 652E; *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999).

For the reasons stated in Part IV, Defamation, above, Ms. Benz has pleaded sufficient facts to make out a claim that the Article placed her in a false light that would be h highly offensive to a reasonable person. She has stated a claim against defendant Publishing Company under Claim Three.

15

### VI. PUBLIC DISCLOSURE OF PRIVATE FACTS

In order to maintain a claim for public disclosure of private facts Ms. Benz must establish: "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts, (4) in which the public has no legitimate concern, (5) and which would be highly offensive to a reasonable person of ordinary sensibilities." *Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989). Ms. Benz has established all elements of this claim. Defendant published, without any waiver or privilege, in the Article private facts about Ms. Benz's personal life to which the public has no legitimate concern and which would be highly offensive to a reasonable person of ordinary sensibilities.

### VII. CONCLUSION

The Court should deny Defendant The Washington Examiner's Motion To Dismiss.

                                                  Respectfully submitted,

                                                  LAW OFFICES OF
                                                    WILLIAM ALDEN MCDANIEL, JR.

                                                   /s/
                                        William Alden McDaniel, Jr.
                                        Bar No. 7152

/s/
Bassel Bakhos
Bar No. 489697

118 West Mulberry Street
Baltimore, Maryland 21201
Tel.:  410.685.3810
Fax:  410.685.0203
wam@wamcd.com
bb@wamcd.com

*Lawyers for Plaintiff, Kathleen A. Benz*

17