IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATHLEEN A. BENZ,                          )
                                           )
            Plaintiff,                     )
                                           )
v.                                         )  Civil Action No. 1:05CV01760 EGS
                                           )
THE WASHINGTON NEWSPAPER                   )
  PUBLISHING COMPANY, LLC, *et al*.,       )
                                           )
            Defendants.                    )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF,
KATHLEEN A. BENZ, IN OPPOSITION TO MOTION OF DEFENDANT JOHN F.
BISNEY TO DISMISS CLAIMS ONE, TWO, THREE, AND FOUR OF THE
COMPLAINT**


        Plaintiff, Kathleen A. Benz, is a thirty-five year old single woman working as an

assignment editor and producer in the Washington, D.C. office of the Cable News Network

(hereinafter referred to as "CNN").  Defendant John F. Bisney, is approximately fifty-one (51)

years old and a former colleague of Ms. Benz at CNN.  CNN discharged defendant Bisney in

June 2005, in part because of his harassment of Ms. Benz.  For the entire time Ms. Benz has

known defendant Bisney, he was not married.

        Starting late in 2004 and continuing to the date Ms. Benz brought this action (if

not later), Bisney commenced a campaign of character assassination against Mr. Benz.  As part

of this campaign, which he conducted largely on the Internet, Bisney stated that Ms. Benz was

having sexual relations with a producer of pornographic movies, used her job to further her

desire to enter into romantic and sexual relationships with older men, and was having sexual

relationships with a wide variety of older men, most of whom she has never met, and with none

of whom has she had sexual relations.  Bisney had impersonated Ms. Benz in replying to

sexually oriented advertisements on the Internet, stating that she was prepared to have sex with

various men who posted advertisements on the Internet whom she had never met.  As detailed

below, Bisney did much more in the same vein.

Now he has moved to dismiss all the claims against him except for Claim Five

(Intentional Infliction Of Emotional Distress), largely on the ground that nothing he said was

defamatory under the law of the District.  His motion has no merit.  It should be denied.

## I.  FIRST AMENDED COMPLAINT

Ms. Benz has made the following allegations in this case.

Ms. Benz first met defendant Bisney sometime in 1997 when they were both

working for the CNN program *Crossfire*, and the two developed a friendship beginning in

November 2002.  First Amended Complaint ¶¶ 15-16.  In May 2005, Ms. Benz ended her

friendship with defendant Bisney when she learned that defendant Bisney, without her

knowledge or permission, had obtained access to her e-mails and read them, had established

and maintained websites on the World Wide Web in her name, and had posted personal and

private information about her on the Web.  *Id*. at ¶ 17.

During the period they were friends, November 2002 through May 2005, Ms.

Benz and defendant Bisney attended concerts together, went to dinner together, and took

vacations together (always staying in separate hotel rooms when they did so).  *Id*. at ¶ 18-19.

Also during their friendship, Ms. Benz accepted gifts from defendant Bisney, as she would

have from any other person whom she considered a friend.  *Id*. at 20.  At no time did Ms. Benz

ever have any type of romantic, sexual, or relationship other than one of friendship with

defendant Bisney.  *Id*. at ¶¶ 22-23.  Ms. Benz never kissed defendant Bisney romantically, never engaged in sexual intercourse with defendant Bisney, never engaged in sexual or genital touching with defendant Bisney, and never engaged in any behavior with defendant Bisney that could be said to denote a romantic or sexual relationship.  *Id*. at ¶¶ 24-27.

Ms. Benz suffers from epilepsy and migraine headaches, both of which she controls, in part, with medication, and for which she has been under the regular care of a physician.  *Id*. at ¶¶ 28-30.  The epilepsy, migraine headaches, and related problems suffered by Ms. Benz are exacerbated by stress and cause her to suffer seizures, severe and debilitating headaches, nausea, and other symptoms.  *Id*. at ¶ 31.  Ms. Benz suffered from these medical conditions when she first met defendant Bisney in 1997 and she told defendant Bisney in 2002 about her conditions and how they were exacerbated by stress.  *Id*. at ¶¶ 32-34.  At that time, Ms. Benz also told defendant Bisney that she took medication to control these conditions and that she was under the regular care of a physician for her epilepsy, migraines, and related problem.  *Id*. at ¶¶ 35-36.

From time to time throughout the period of their friendship, defendant Bisney saw Ms. Benz suffer seizures, severe and debilitating headaches, nausea, migraine headaches, and saw Ms. Benz pass out.  *Id*. at ¶¶ 37-41.  He also observed her Benz in the hospital, taking medication, and visiting her physicians for her treatments of these disorders.  *Id*. at ¶¶ 42-44.

Ms. Benz also discussed the fact that she did not have the necessary income and assets to pay her expenses and on numerous occasions, defendant Bisney offered to provide money to help her out.  *Id*. at ¶¶ 48-49.  When he did so, defendant Bisney stressed that he had extensive inherited wealth, that he had numerous lucrative investments, that he had sizable discretionary income, that he had sufficient money to live without working, that he did not have

any family, children, or dependents who depended on him for assistance, and that he did not expect Ms. Benz to pay back any of the money that he provided her. *Id*. at ¶¶ 50-55. On the strength of his representations in this regard, Ms. Benz from time to time accepted money from Mr. Benz.

Throughout their friendship together, defendant Bisney expressed to Ms. Benz his desire to have a romantic and sexual relationship with plaintiff, Kathleen A. Benz. *Id*. at ¶ 56. Each time he did so—and other occasions as well—Ms. Benz replied in unequivocal language that she was only interested in being friends, that she was not interested in a romantic or sexual relationship of any type, and that she was not interested in dating defendant Bisney. *Id*. at ¶ 57.

In March 2004, Ms. Benz discovered that defendant Bisney had accessed her e-mail and read hundreds of messages without her permission. *Id*. at ¶¶ 58-60. In late 2004, defendant Bisney increased his pressure on Ms. Benz to enter into a romantic and sexual relationship with him, pressure that Ms. Benz continued to resist. *Id*. at ¶ 61. Indeed, she told him that if he persisted in pressuring her, Ms. Benz would break off her friendship with him. *Id*. at ¶ 62. At that point, defendant Bisney changed his story about the money he had given Ms. Benz and began characterizing the money as a loan and demanding immediate repayment. *Id.* at ¶ 63.

At about this same time in late 2004, defendant Bisney sent Ms. Benz an e-mail containing an "article" authored by defendant Bisney stating, in part, that Ms. Benz sought friendships with wealthy men for the purpose of procuring money from them. *Id*. at ¶ 64. The fake "article" named several such targets of Ms. Benz: Gary Williams, the Maryland basketball coach; "venture capitalist" Mark Ein, "Democratic superlawyer" Julian Epstein, United States

Representative Pete Session (R.TX), "Georgetown hairdresser to the stars" Paul Bosserman,

John Sununu, Sr., "multi-millionaire" John Daggitt, and "recent paramour" John F. Bisney,

Ms. Benz, as noted, had never dated defendant Bisney.  *Id*. at ¶ 65.  She had briefly dated Gary

Williams, Paul Bosserman, Julian Epstein (over ten years before), and John Daggitt (five years

before); and at no time did Ms. Benz ever seek the friendship of any of the men named in the

fake article for the purpose of procuring money from them.  *Id*. at ¶ 66-68.  Defendant Bisney

threatened to send this "article" to *The Washingtonian* magazine if Ms. Benz did not do what

he demanded.

        In May 2005, Ms. Benz's father informed her that he had found two Internet

Sites that were using her name, www.kathy-benz.net and www.kathy-benz.com.  *Id*. at ¶ 69.

Ms. Benz had not established these Internet sites or authorized anyone else to do so.  *Id*. at ¶¶

70-71.  Upon viewing these Internet sites, Ms. Benz found that they linked to other websites

dealing with negative character traits, such as narcissism, self-importance, arrogance, and

haughtiness.  *Id*. at ¶¶ 73-75.  On May 9, 2005, Ms. Benz communicated with employees of the

Internet host for these two websites, GoDaddy.com, and was informed that defendant Bisney

had established these two Internet sites.  *Id*. at ¶¶ 75-76.  Ms. Benz then told defendant Bisney

that she had learned from GoDaddy.com that he had established these two Internet sites.  *Id*. at

¶ 77  In response, defendant Bisney lied, denying any involvement with establishing these two

Internet sites.  *Id*. at ¶ 78.

        At that point, Ms. Benz sent an e-mail message to defendant Bisney telling him

not to communicate with her in any way.  *Id.* at ¶ 79.  Defendant Bisney responded by

admitting that he had been responsible for creating the two Internet sites and that he had lied

when he denied responsibility for doing so.  *Id*. at ¶ 80.

Two days later, while covering a press conference for her employer, CNN, Ms. Benz noticed defendant Bisney pacing back and forth behind her and staring at her in a hostile and intense way, causing her to feel uncomfortable, scared, and fearful for her safety. *Id*. at ¶ 82. Two hours after this press conference, defendant Bisney e-mailed Ms. Benz and commented on her physical appearance at the press conference. *Id*. at ¶ 83.

The very next day, Ms. Benz learned of a third website, www.kathy-benz.org, on the World Wide Web that she had neither created nor authorized. *Id*. at ¶¶ 84-86. She accessed this third Internet website and found that contained several statements listing unpleasant character traits about her, including, for example: "[f]eels grandiose and self-important;" "obsessed with fantasies;" "uses others to achieve her own ends;" "devoid of empathy;" and "behaves arrogantly and haughtily." *Id*. at ¶¶ 87-88 Ms. Benz again contacted employees of GoDaddy.com, also the host for this third site. *Id*. at ¶ 89. They told her that defendant Bisney had also established this third Internet website. *Id*. at ¶ 90.

Ms. Benz then communicated with friends of defendant Bisney in an attempt to have them persuade defendant Bisney to take this third Internet website down. *Id*. at ¶ 91. After doing so, Ms. Benz checked this third Internet website and discovered that not only had it remained active, but that defendant Bisney had added photographs of Ms. Benz wearing only a bikini, photographs taken by defendant Bisney while on vacation with Ms. Benz. *Id*. at ¶¶ 92-93.

Ms. Benz had never known of the existence of any of these Internet sites before her father called to tell her about them. *Id*. at ¶ 95. At no time did Ms. Benz ever authorize anyone to establish an Internet site in or using her name, to post on any Internet site any

personal information about her, or to post on any internet site any photographs of her. *Id.* at ¶¶ 96-98.

By no later than May 10, 2005, Ms. Benz had instructed defendant Bisney not to communicate with her in any way or to come near her. *Id.* at ¶¶ 99-100. Despite Ms. Benz instructing the security service in her building not to permit defendant Bisney to enter, on May 25, 2005, defendant Bisney entered the apartment building where Ms. Benz resides and slipped a card under her door. *Id.* at ¶ 101-102.

On June 1, 2005, Ms. Benz brought a civil action in the Superior Court of the District of Columbia and filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction requesting the Superior Court of the District of Columbia to enjoin defendant Bisney from communicating with Ms. Benz in any way and from creating or maintaining any websites referring to her. *Id.* at ¶¶ 103-104. On June 8, 2005, the Superior Court entered a Temporary Restraining Order against defendant Bisney enjoining him "from creating or maintaining, directly or through a third party, any Internet website referring in any way to plaintiff" and providing that defendant Bisney could not "'blog' or participate in any Internet chat rooms regarding plaintiff." *Id.* at ¶ 105. On June 11, 2005, Ms. Benz and defendant Bisney executed a "Binding Settlement Agreement and Release," which stated in part, "[t]he parties agree that they will not intentionally contact or communicate with each other." *Id.* at ¶¶ 106-107.

Despite this settlement agreement, starting in July 2005, defendant Bisney began a campaign of harassment, identity-theft, Internet stalking, and defamation to destroy the health, reputation, and well-being of plaintiff, Kathleen A. Benz. *Id.* at ¶ 108. On about July 19, 2005, defendant Bisney wrote a second fake news article entitled "Politics And Porn Stars,"

stating that Ms. Benz is dating Mark Kulkis, president and CEO of Kick Ass Pictures, a company that produces pornographic movies; that Ms. Benz is a "Washington powerdater;" that Ms. Benz told her girlfriends "Mark's a wonderful guy and I think this could be the real thing;" and that Ms. Benz is "known in Washington power circles" for dating numerous men, including Jonathan Ledecky, Gary Williams, and Mel Karmazin, with whom the article alleges that Ms. Benz "spent time last August…at his Hamptons home."  *Id*. at ¶¶ 109-110.  Defendant Bisney posted this second fake article on numerous Internet sites, many of them containing explicit sexual material, such as "SXXXY.org," "Scuttleslut.blogspot.com," "PornNews.com," "Submittodesire.tripod.com," and numerous other sites.  *Id*. at ¶ 112.

Ms. Benz has never dated or had any romantic or sexual involvement with Mark Kulkis, Jonathan Ledecky, or Mel Karmazin, indeed, she does not even know Mel Karmazin and has never visited him at his home in the Hamptons or anywhere else.  *Id*. at ¶ 111.  Ms. Benz does know Craig Karmazin, the son of Mel Karmazin, although she has never had a romantic or sexual relationship or ever dated Craig Karmazin.  *Id*. at ¶ 126.  On an occasion in 2005, defendant Bisney was present when Ms. Benz spoke on the telephone with Craig Karmazin.  *Id*. at ¶ 127.  When he overheard her use the name "Karmazin," defendant Bisney became agitated and hostile and accused Ms. Benz of having a romantic and sexual relationship with Mel Karmazin, who had once fired defendant Bisney from a radio job.  *Id*. at ¶ 128.  Despite her telling him that she did not even know Mel Karmazin, defendant Bisney broke down in tears.  *Ibid*.

On about July 31, 2005, defendant Bisney modified the fake article referred to above by adding additional men whom he claims Ms. Benz had romantic involvement, specifically Representative Pete Sessions, John Sunnunu, Sr., and Mark Ein.  *Id*. at ¶ 113.  In

other Internet postings, defendant Bisney added the names of John McDonough, whom he

identified as "Chicago Cubs VP," and Julian Epstein.  *Id*. at ¶ 115.  Ms. Benz has never had any

romantic or sexual involvement of any type with Pete Sessions, John Sunnunu, Sr., or Mark

Ein, and does not know any person employed or affiliated with the Chicago Cubs, including

any "John McDonough."  *Id*. at ¶¶ 114, 116.  Ms. Benz has a professional, but not a sexual or

romantic, relationship with John McDonough, an agent of the United States Secret Service, and

had referred to Secret Service Agent John McDonough in conversations with defendant Bisney.

*Id*. at ¶¶ 121-123.  Defendant Bisney had sent two e-mails to Ms. Benz stating "you said you're

not a baseball fan but you never mentioned JD," following this up with a clarification the next

day that read, "McDonough (not 'JD')."  *Id*. at ¶¶ 124-125.

Defendant Bisney posted similar versions of these fake articles on several

other websites with a photograph of Ms. Benz juxtaposed to a photograph of Mark Kulkis,

including bc.indymedia.org and www.dailysexreview.com, where defendant Bisney wrote:

"Finally, a relationship in which Kulkis isn't the sluttier one."  *Id*. at ¶ 117.  Defendant Bisney

added:  "Happy herpes!"  *Ibid*.

CNN had assigned Ms. Benz to produce and cover a press conference being held

June 14, 2005, by Mary Carey, a pornographic movie star who had come to Washington, D.C.,

with Mark Kulkis, a producer of pornographic films.  *Id*. at ¶ 129.  CNN and numerous other

broadcasters showed the press conference held by Mary Carey and anyone watching could have

seen that Ms. Benz was covering the press conference for CNN.  *Id*. at ¶ 130.  That is the extent

of her relationship with Mark Kulkis.

On or about July 21, 2005, defendant Bisney sent the fake news article, this time

entitled "Porn Baron + CNN Producer" to WhatshappeningatCNN.blogspot.com, a website

about events of interest to employees of CNN that a high percentage of CNN employees regularly read. *Id*. at ¶¶ 132-133. This article remains available there to this date.

Since July 2005, defendant Bisney has sent electronic mail messages to members of the family of Ms. Benz directing them to pornographic websites where the fake articles about Ms. Benz are available. *Id*. at ¶ 134. In addition, defendant Bisney has sent the article to various associates of Ms. Benz. For example, Ms. Benz has been involved with a charity known as "Hoop Dreams," and in August 2005, defendant Bisney sent a fake electronic mail message in the name of Susan Kay, the chair of the board of Hoop Dreams, to the members of the board of directors of Hoop Dreams directing those directors to the fake news articles about Ms. Benz and Mark Kulkis. *Id*. at ¶¶ 135-137. Susan Kay did not authorize or send the electronic mail message that defendant Bisney sent out in her name. *Id*. at ¶ 138. On or about August 22, 2005, defendant Bisney sent a fake electronic mail message purportedly from Phil Kent, the superior of Ms. Benz at CNN, stating: "I would strongly warn you to maintain better boundaries between your life and your employment. This is critical to maintain the professional integrity of our product." *Id*. at ¶¶ 139-140. Mr. Kent did not sent this message. *Id*. at ¶ 139. On July 31, 2005, at approximately 3:01 a.m., defendant Bisney sent a fake electronic mail message from Dr. Sanjay Gupta, CNN medical correspondent, to Ms. Benz. Dr. Gupta did not send this message. *Id*. at ¶ 141.

Since at least late August, 2005, defendant Bisney has impersonated Ms. Benz by replying in her name with her home telephone number, personal work telephone number, home address, and electronic mail address to personal advertisements seeking sexual relations posted on websites such as www.craigslist.com. *Id*. at ¶ 142. Ms. Benz has never responded to any personal ads on <u>www.craigslist.com</u>, yet as a result of defendant Bisney's impersonation of

Ms. Benz, persons who have posted personal advertisements seeking sexual relations on www.craigslist.com have communicated with Ms. Benz in a graphic sexual nature in numerous telephone calls and electronic mail messages. *Id*. at ¶¶ 143-146. Ms. Benz has been severely upset by this type of contact and fears for her safety knowing that persons seeking sexual relations—and  who believe she is seeking sexual relations with them—have been provided her home and work telephone numbers, home address, and e-mail address by defendant Bisney. *Id*. at ¶ 147.

On about August 26, 2005, defendant Bisney sent an electronic mail message to a weblog that addresses matters relating to Texas politics stating Ms. Benz was having an affair with Representative Pete Sessions, who is married, and that Ms. Benz was having a romantic and sexual relationship with Kinky Friedman, a Texas author and politician. *Id*. at ¶¶ 148-150. Ms. Benz has never had a romantic or sexual relationship—and has never dated—either Rep. Sessions or Kinky Friedman. *Id*. at ¶¶ 151-152.

On about August 19, 2005, defendant Publishing Company published in its print publication, *The Washington D.C. Examiner*, and posted on its website, www.dcexaminer.com, an article under the byline of one Karen Feld, entitled "Controversial Love for CNN Producer." *Id*. at ¶¶ 162, 165. This article contained—word for word—the false and defamatory statements Ms. Benz that defendant Bisney had been sending to various other websites. Defendant Publishing Company did not attempt to speak or attempt to speak with Ms. Benz before publishing this article. *Id*. at ¶ 166. When Ms. Benz spoke with Karen Feld and told Ms. Feld that the article was false, Feld told her that defendant Publishing Company would not print a retraction and that Ms. Benz should "just get used to it." *Id*. at ¶¶ 175-179.

Ms. Benz has never suffered from this type of harassment, defamation, annoyance, and intimidation from anyone else and cannot conceive of anyone who would subject her to this other than defendant Bisney. Other than defendant Bisney, no one Ms. Benz has ever known has ever engaged in the activities set forth above with regard to her or anyone else she knows, or so much has threatened to do so. As a result of what Ms. Benz has been through in the past two (2) months, she has suffered a worsening of her symptoms, including headaches, nausea, extreme anxiety, and other despair that her reputation is being ruined in this way. Ms. Benz is a private person and it causes her deep anguish and embarrassment to have her life exposed on the Internet as it has been. It is especially troublesome to Ms. Benz that defendant Bisney has directed his false and scurrilous statements about her to her family and to her colleagues at CNN.

Defendant The Washington Newspaper Publishing Company, LLC publishes and distributes *The Washington Examiner*, a free, daily "newspaper" in the Washington, D.C. metropolitan area, including suburbs in Maryland and Virginia. First Amended Complaint ¶ 10. Defendant The Washington Newspaper Publishing Company, LLC also maintains an Internet site, www.dcexaminer.com, where articles from the print editions of *The Washington Examiner*, are available free of charge to anybody with access to the World Wide Web. *Id*. at ¶ 165.

On August 19, 2005, defendant The Washington Newspaper Publishing Company, LLC published a defamatory article under the byline of one Karen Feld entitled "Controversial Love For CNN Producer" (hereinafter referred to as "the Article"). The Article appeared in Ms. Feld's gossip column entitled "The Buzz," and contained numerous false, defamatory, and private statements about the personal life of Ms. Benz. The Article made Ms.

Benz appear as an opportunistic woman who used her career at CNN to meet and become romantically involved with several influential men.  Had defendant The Washington Newspaper Publishing Company, LLC or Ms. Feld bothered to engage in basic research and fact-checking, they would have realized that nothing is further from the truth.

Defendant The Washington Newspaper Publishing Company, LLC published in Ms. Feld's *The Buzz* gossip column a Correction (hereinafter referred to as "the Correction") of the Article.  In the Correction, defendant The Washington Newspaper Publishing Company, LLC admitted it believed it was "the target of an 'internet spoofer.'"

On September 2, 2005, Ms. Benz filed a five claim Complaint against defendant The Washington Newspaper Publishing Company, LLC and defendant John F. Bisney, seeking compensatory and punitive damages and injunctive relief against defendant The Washington Newspaper Publishing Company, LLC for defamation, invasion of privacy – public disclosure of private facts, and false light invasion of privacy. Ms. Benz filed a First Amended Complaint October 20, 2005, to add the Correction to her claims against defendant The Washington Newspaper Publishing Company, LLC.  Defendant The Washington Newspaper Publishing Company, LLC has moved to dismiss Claims One (Defamation), Three (Invasion Of Privacy – Public Disclosure Of Private Facts), and Four (False Light Invasion Of Privacy) of the First Amended Complaint with prejudice under FED. RULE CIV. PRO. 12(b)(6) for failure to state claims upon which relief can be granted.  Measured by the standards governing the decision of such motions under District Of Columbia and federal law, which require that "a complaint should not be dismissed for failure to state a claim unless it appear *beyond doubt* that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief."

*Conley v. Gibson*, 335 U.S. 41, 45-46 (1957)(emphasis added), this Motion must fail.  Ms.

Benz's pleading readily meets the notice pleading requirements of FED. R. CIV. PRO. 8(a).

### III.     MOTION TO DISMISS

        Defendant's motion asks the Court to dismiss Claim One (Defamation) for two

reasons:  (1) none of the statements Ms. Benz alleges are defamatory are capable of defamatory

meaning and (2) the statements Ms. Benz alleges are unactionable opinions incapable of

supporting a claim for defamation.  Defendant Bisney asks the Court to dismiss Claim Two

(Invasion Of Privacy – Intrusion Upon Seclusion) because Ms. Benz has not alleged any

actions subsequent to a Binding Settlement Agreement And Release in Ms. Benz's previous

case against defendant Bisney.  Defendant Bisney asks the Court to dismiss Claim Three

(Invasion Of Privacy – Public Disclosure Of Private Facts) because the only facts he allegedly

revealed about Ms. Benz were her personal and work contact information both available on the

World Wide Web or in the telephone book.  Defendant Bisney finally asks the Court to dismiss

Claim Four (False Light Invasion Of Privacy) for all the reasons cited in his motion to dismiss

Claim One and in Defendant The Washington Examiner's Motion To Dismiss.

        Under FED. RULE CIV. PRO. 12(b)(6), "a complaint should not be dismissed for

failure to support a claim unless it appears beyond doubt that the plaintiff can prove no set of

facts in support of [her] claim which would entitle [her] to relief."  *Conley v. Gibson*, 355 U.S.

41, 45-46 (1957).  This "straight-forward principle enunciated by the Supreme Court in Conley

has been reaffirmed and applied in numerous cases in every quadrant of the federal judicial

system."  5B C. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE:  CIVIL 3D § 1357, at

571 (2004) (hereinafter referred to as "WRIGHT & MILLER").

The test here, then, is whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief" under the law of the District of Columbia governing her substantive claims. *Conley, supra,* 355 U.S. at 45-46. Under the familiar RULE 12(b)(6) standards, this Court must view the facts presented in the pleadings and all inferences drawn therefrom in a light most favorable to Ms. Benz. *Edwards v. City of Goldsboro*, 178 F.3d 231, 248 (C.A.4 1999). In this analysis, "all of the well pleaded factual allegations in the [Complaint] are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." 5C WRIGHT & MILLER § 1368, at 230; *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (C.A.4 1993).

Under FED. RULE CIV. PRO. 8(f), "[a]ll pleadings shall be so construed as to do substantial justice." "A complaint is generally sufficient so long as it … provides 'adequate notice' to the defendant regarding the essential elements of the plaintiff's claim." *Smith-Berch, Inc. v. Baltimore County, Maryland*, 68 F.Supp.2d 602, 625-626 (D.Md. 1999). Measured by these standards, Claims One, Two, Three, and Four each "state a legally cognizable claim for relief" under District of Columbia law.

## IV.    DEFAMATION

With respect to the statements in the Article, defendant Bisney adopts the arguments in Defendant The Washington Examiner's Motion To Dismiss and memorandum in support thereof. *Memorandum Of Points And Authorities In Support Of Motion Of Defendant John F. Bisney To Dismiss Claims One, Two, Three, And Four Of The Complaint* (hereinafter referred to as "*Defendant's Memorandum*"), at 4. To the extent defendant Bisney has adopted any of the arguments made in Defendant The Washington Examiner's Motion To Dismiss and memorandum in support thereof, Ms. Benz adopts the arguments made in her Memorandum Of

Points And Authorities Of Plaintiff, Kathleen A. Benz, In Opposition To Defendant The Washington Examiner's Motion To Dismiss.

To state a claim for defamation under District Of Columbia law, a plaintiff must allege four elements: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement was at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Crowley v. North Am. Telecomms. Ass'n, supra,* 691 A.2d at 1173 n.2 (D.C. 1997). Under District law, "a publication is defamatory 'if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'" *Howard University v. Best*, 484 A.2d 958, 988 (D.C. 1984). "The trial judge has the responsibility to determine whether the statements in question are capable of carrying a defamatory meaning." *Id.* at 989. When this determination is made, "the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it was addressed." *Ibid.* Accordingly:

> "*only* when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in a defamatory sense, can it rule as a matter of law that it was not libelous." *Ibid.* (emphasis added).

Ms. Benz's defamation claim against defendant Bisney rests in part upon several variations of a fake "article" that defendant Bisney first e-mailed to Ms. Benz in late 2004. First Amended Complaint ¶ 64. This fake "article" contained in the electronic mail message from defendant Bisney stated that Ms. Benz sought friendships with wealthy men, including University Of Maryland basketball coach Gary Williams, venture capitalist Mark Ein,

democratic superlawyer Julian Epstein, Georgetown hairdresser to the stars Paul Bosserman, United States Representative Pete Sessions, John Sunnunu, Sr., multi-millionaire John Daggitt, and defendant Bisney, for the purpose of procuring money from them.  First Amended Complaint, at ¶¶ 64-65.  A complete and accurate copy of this electronic mail message from defendant Bisney to Ms. Benz was attached as Exhibit 1 to the original Complaint in this case.

Variations of defendant Bisney's first fake "article" began appearing on various Internet sites beginning on or about July 19. 2005.  First Amended Complaint, at ¶ 109.  One article in particle entitled "Politics And Porn Stars" and attached as Exhibit 6 to the original Complaint in this case stated that Ms. Benz was dating Mark Kulkis, president and CEO of Kick Ass Pictures, a company that produces pornographic films.  *Id*. at ¶ 110.  This "article" went on to state that Ms. Benz told her girlfriends "Mark's a wonderful guy and I think this could be the real thing."  *Ibid*.  The "article" accused Ms. Benz of being "known in Washinton power circles" for dating numerous men, including venture capitalist Jonathan Ledecky, Gary Williams, and Mel Karmazin, CEO of Sirius radio, with whom the article alleged Ms. Benz had "spent time last August…at his Hamptons home."  *Ibid*.  These statements are false and defamatory as Ms. Benz has never dated or had any romantic or sexual relationship with Mark Kulkis, Jonathan Ledecky, or Mel Karmazin.  *Id.* at ¶ 111.  Ms. Benz does not even know Mr. Karmazin and has never visited his home in the Hamptons.  *Ibid*.

Defendant Bisney began to post more variations of this "article" on the World Wide Web.  *Id*. at ¶ 112.  Variations of the "article" continued to link Ms. Benz with individuals she has never had any type of romantic or sexual relationship with including Representative Pete Sessions, John Sunnunu, Sr., Mark Ein, and Chicago Cubs VP  John McDonough.  *Id*. at ¶¶ 113-116.

Defendant Bisney posted one of these "articles" on the Internet site

www.dailysexreview.com in which he romantically linked Ms. Benz with Mr. Kulkis and

concluded his "article" with the sentence, "Finally, a relationship in which Kulkis isn't the

sluttier one.  Happy herpes!"  *Id.* at ¶117.  A copy of this "article" was attached as Exhibit 7 to

the original Complaint in this case.  Copies of sixteen (16) of the hundreds of variations of

defendant Bisney's fake articles were attached as Exhibit 11 to the original Complaint in this

case.  *Id.* at 131.

Considered as a whole, however, each of the articles painted a picture of Ms.

Benz as a woman who used her position at CNN to obtain access to wealthy, powerful, older

men with whom she could have sexual and romantic relationships.  It linked her directly with

Kulkis, a producer of pornographic films, as her latest love interest, but also named a host of

other older, powerful, and wealthy men as her "regular companions."  The articles portrayed

Ms. Benz in such a way as to tend to "'injure plaintiff in [her] trade, profession or community

standing, or lower [her] in the estimation of the community.'"  *Howard University v. Best*, 484

A.2d 958, 988 (D.C. 1984) (quoting *McBride v. Merrell Dow and Pharmaceuticals Inc*., 540

F.Supp. 1252, 1254 (D.D.C. 1982).

Bisney does not analyze the various articles as a whole, however, but isolates

nine statements and argues that none of them is defamatory.  Just focusing on one of those

statements reveals how bankrupt this argument is.  Bisney stated that Ms. Benz had "spent

time" with Mel Karmazin at his Hamptons home.  The articles identified Karmazin as the CEO

of a large company, Sirius Satellite Radio, and thus as an older, wealthy, powerful man.  This

statement came in the context of statements about Ms. Benz being a "powerdater," being a

relationship with Kulkis, using her position to gain access to various powerful men, and having

numerous male "regular companions." As such, the meaning conveyed by this statements is unmistakable: that Ms. Benz used her position at CNN to obtain access to men such as Karmazin, then engaged in romantic and sexual liaisons with them. This is the more apparent when the websites to which Bisney sent these articles as considered. As detailed above, these were websites that dealt with one topic: sex.

Take as another example the statement that Ms. Benz was engaging in a romantic relationship with Kulkis for the purpose of "getting a scoop" for CNN. This statement is capable of defamatory meaning that Ms. Benz engages in her serial relationships with powerful men solely for the purpose of furthering her career.

Indeed, Bisney's various articles constitute the type of allegations of "serious sexual misconduct" that the RESTATEMENT (SECOND) OF TORTS § 574 found have traditionally supported the imposition of liability without proof of special damages. "Serious sexual misconduct," the RESTATEMENT noted, "has been generally applied to any statement that imputes any form of unchastity to a woman, married or single, irrespective of whether the conduct charged constitutes a criminal offense." *Id*. Comment: *b.*, at 196.

> "The rule applies to a statement charging a woman with specific acts of adultery, fornication or any other form of sexual intercourse with a man other than her husband, as well as to general chares of unchaste conduct." *Ibid*.

Moreover, the articles also fall within another category recognized by the RESTATEMENT as permitting recovery without proof of actual damages, that of defamatory remarks about one's profession, business, or trade. As the RESTATEMENT noted, publications that "disparage the other in the pursuit of [her] business, trade, [or] profession" or that "tend to

harm [her] in it" have been treated at actionable without proof of special damages.

RESTATEMENT (SECOND) OF TORTS § 573, Comment: *c*, at 192-193.

      Bisney next makes the argument that his statement, "Finally, a relationship in which Kulkis isn't the sluttier one. Happy Herpes!" is a statement of opinion not containing verifiable facts and therefore not actionable as defamation. *Id*. at 6-7. The meaning of this entire sentence is that Ms. Benz is sluttier than a male who produces pornographic films. A "slut" is commonly understood to be a promiscuous woman. As such, this statement falls within the reach of the RESTATEMENT provisions discussed above.

      For some reason, Bisney ignores completely the other allegations of defamation stated in the First Amended Complaint. He does not address the allegation that he defamed her when he sent an email claiming that Ms. Benz was having a sexual affair with a married Texas congressman, Pete Sessions; or when he stated that she was having an affair with the Texas politician Kinky Friedman; when he impersonated her on the Internet in responding to advertisements seeking sex, replying in her name that she was interested in sexual encounters with persons she had never met; or by sending phone email messages to her employer and to the members of the board of a charity Ms. Benz works for regarding the fake articles about Kulkis. For these reasons alone, his motion as to Claim One must be denied.

      Claim One states a claim for relief against Bisney sounding in defamation under the law of the District of Columbia. Bisney's motion as to this Claim should be denied.

## V.    INVASION OF PRIVACY – INTRUSION UPON SECLUSION

      In order to state a claim for invasion of privacy – intrusion upon seclusion a plaintiff must allege: "(1) an invasion or interference by physical intrusion, by use of the defendant's sense of sight or hearing, or by use of some other form of investigation or

examination; (2) into a place where the plaintiff has secluded himself [or herself], or into his [or her] private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." *Danai v. Canal Square Associates*, 862 A.2d 395, 400 (D.C. 2004).  Ms. Benz has adequately plead all of these elements.

Ms. Benz suffers from a form of herpes, a private fact unknown to only a few of her close friends, such as Bisney.  In one version of his article, Bisney stated that as the "sluttier" one of the couple, Ms. Benz would transmit herpes to Kulkis.  This allegation meets the pleading requirements to state a claim under *Danai, supra.*

## VI.    INVASION OF PRIVACY – PUBLIC DISCLOSURE OF PRIVATE FACTS

In order to assert a claim of invasion of privacy – public disclosure of private facts, a plaintiff must allege:  "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts, (4) in which the public has no legitimate concern, (5) and which would be highly offensive to a reasonable person."  *Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989).

Defendant Bisney has repeatedly disclosed private facts about Ms. Benz, including the herpes condition referred to above.  He also, in response to various explicit personal ads on the World Wide Web, provided Ms. Benz's home telephone number, personal work telephone number, home address, and electronic mail address.  First Amended Complaint ¶ 142.  Defendant Bisney argues Ms. Benz's work telephone and electronic mail address are readily available on the World Wide Web and her home address and telephone number are available in the telephone directory and therefore defendant Bisney cannot be held liable for disclosing information already known to the public.  *Defendant's Memorandum*, at 10.  Citing *Vassiliades v. Garfinkel's*, 492 A.2d 580, 588 (D.C. 1985), defendant Bisney further argues that the mere posting of Ms. Benz's personal contact information cannot amount to an unreasonable

and serious interference with protected interests.  Defendant's argument suffers from a fatal

flaw:  Ms. Benz's personal information may be available, but defendant Bisney directed this

personal information to individuals seeking to have sexual relations in such a manner that

would lead the recipients of such information to believe Ms. Benz desired to engage in sexual

relations with them, thus enabling a targeted group of persons to have access to this

information.

## VII.    FALSE LIGHT INVASION OF PRIVACY

Defendant correctly notes the same analysis applies to defamation claims as

does false light invasion of privacy claims.  *Harrison v. Washington Post Co.*, 391 A.2d 781,

784 (D.C. 1978).  Defendant incorporates his prior arguments in his own motion and the

arguments in Defendant The Washington Examiner's Motion To Dismiss.  Ms. Benz adopts the

previous arguments in opposition to defendant Bisney's motion to dismiss her defamation

claim and the section of the Memorandum Of Points And Authorities Of Plaintiff, Kathleen A.

Benz, In Opposition To Defendant The Washington Examiner's Motion To Dismiss opposing

defendant's motion to dismiss Ms. Benz's defamation and false light invasion of privacy

claims.

## VIII.    CONCLUSION

The Court should deny the Motion Of Defendant John F. Bisney To Dismiss

Claims One, Two, Three, And Four Of The Complaint.

22

Respectfully submitted,

LAW OFFICES OF
   WILLIAM ALDEN MCDANIEL, JR.


_____/s/_____
William Alden McDaniel, Jr.
Bar No. 7152




_____/s/_____
Bassel Bakhos
Bar No. 489697

118 West Mulberry Street
Baltimore, Maryland 21201
Tel.:  410.685.3810
Fax:  410.685.0203
wam@wamcd.com
bb@wamcd.com

*Lawyers for Plaintiff, Kathleen A. Benz*

MPA Opp Bisney MTD 2.doc