**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **KATHLEEN A. BENZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:05cv1760 (EGS)** |
| | ) | |
| **THE WASHINGTON NEWSPAPER** | ) | |
| **PUBLISHING COMPANY, LLC** | ) | |
| **and** | ) | |
| **JOHN F. BISNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**REPLY IN SUPPORT OF DEFENDANT
THE WASHINGTON EXAMINER'S MOTION TO DISMISS**

Defendant The Washington Newspaper Publishing Company, LLC, publisher of *The Washington Examiner* ("the *Examiner*") hereby submits this Reply in response to Plaintiff's opposition ("Opp.") to the *Examiner*'s Motion to Dismiss Plaintiff Kathleen A. Benz's Complaint against the *Examiner* pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

**PRELIMINARY STATEMENT**

While acknowledging that the question before the Court – the <u>only</u> question before the Court – is whether the Article in the *Examiner* viewed as a whole is reasonably capable of the defamatory meaning plaintiff urges, Plaintiff nonetheless focuses only on two words – "hooked up" – divorced from the other statements in the Column and divorced from the context in which they appear, examining instead usage in wholly extraneous texts outside the four corners of the Column and the Amended Complaint, to show that someone – reasonable or not – could understand the text to accuse Plaintiff of "having engaged in sexual relations without any

emotional attachment" and "used her job to obtain romance and sexual relations" with "older, wealthy, powerful men."  Opp. at 6-7.  When, however, the Column is examined as a whole and the language is examined in context and in conjunction with the remaining text, it is clear on its face and as a matter of law that the Column is not reasonably capable of conveying the defamatory meaning urged by Plaintiff and, even if it were, "sex without emotional attachment" between consenting adults would not be defamatory in contemporary Washington.  This Column is not an investigative report on Plaintiff's sexual or professional misconduct but a typical gossip item sprinkled with bold-faced names that describes in breezy tones who is dating whom.  There is no mention of sex, casual or otherwise, and the statement that Plaintiff has "hooked up" with Mr. Kulkis is clearly just another entry in the list of guys with whom the Column says Plaintiff has been "linked romantically."  "Offensive or unpleasant" perhaps, but no amount of huffing and puffing about "chutzpah" or her justified fury at John Bisney can inflate the relatively benign meaning of the *Examiner*'s Column to the level of "odious, infamous or ridiculous" required to state a $30 million dollar libel claim.  *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (to be actionable, has to be "more than offensive or unpleasant," it must "make plaintiff appear 'odious, infamous or ridiculous' ").  As the D.C. Court of Appeals has noted, "not every uncomplimentary publication is libelous."  *Guilford Transportation Industries v. Wilner*, 760 A.2d 580, 594 (D.C. 2000).

## I.    MOTION TO DISMISS STANDARD

In what is unfortunately an all too frequent tactic adopted in Plaintiff's Opposition – base an accusation on a partial quote of the relevant language and omit the language that contradicts – Plaintiff asserts that the *Examiner*, citing an out-of-date edition of Wright & Miller in its Motion to Dismiss, relied on a superceded standard on a motion to dismiss.  Opp. at 7.  In point of fact,

the statement cited by the *Examiner* – "[w]hen the claim alleged is a traditionally disfavored 'cause of action,' such as … libel, or slander, the courts [tend] to construe the complaint by a somewhat stricter standard and [are] more inclined to grant a Rule 12(b)(6) motion to dismiss" – can be found at page 731 of the <u>current</u> edition of Wright & Miller.  5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure 2d* § 1357 (3d ed. 2004).  The *Examiner* did not argue that this Court should use a stricter pleading standard beyond that required by Rule 8;[1] merely that, in the context of a complaint alleging defamation, due to the significant First Amendment concerns at stake, the 12(b)(6) standard is applied with particular care – care that is still required by the D.C. courts.

> Libel suits, if not carefully handled, can threaten journalistic independence.  Even if many actions fail, the risks and high costs of litigation may lead to undesirable forms of self-censorship.  We do not mean to suggest by any means that writers and publications should be free to defame at will, but rather that suits – particularly those bordering on the frivolous – should be controlled so as to minimize their adverse impact upon press freedom.

*McBride v. Merrell Dow & Pharms, Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983).  In this jurisdiction, " '[i]n the First Amendment area, summary procedures are . . . essential.' "  *White v. Fraternal Order of Police*, 707 F. Supp. 579, 586 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990) (citation omitted), for "the stake here . . . is free debate . . . .  The threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself."  *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1011 (1967).  *See, e.g., Coles v. Washington Free Weekly, Inc.,*

---

[1] Although the *Examiner* did not argue stricter pleading requirements, the case cited by plaintiff as abandoning stricter pleading requirements for defamation cases, *Crowley v. North American Telecommunications Ass'n*, 691 A.2d 1169 (D.C. 1997) (Opp. at 9) does no such thing.  The D.C. Court of Appeals cites cases from the federal court in D.C. that have required "heightened standard of pleading in defamation cases," a standard which the *Crowley* court found satisfied by the complaint in issue in that case.

881 F. Supp. 26, 30 (D.D.C. 1995) ("Given the threat to the first amendment posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted"), *aff'd*, 88 F.3d 1278 (D. C. Cir. 1996).

The only issue before this Court on the motion is whether the Column is "'capable of conveying'" the defamatory meaning alleged by a plaintiff – an issue that "courts are charged with the responsibility of determining" as a matter of law. *White*, 909 F.2d at 518 (citation omitted); *Moldea v. New York Times Co.*, 22 F.3d 310, 316-17 (D.C. Cir.) ("[T]his appeal presents a pure question of law . . . . In this situation, we must determine as a threshold matter whether a challenged statement is capable of a defamatory meaning") (citation omitted), *cert. denied*, 513 U.S. 875 (1994). In this case, "close judicial scrutiny" through a threshold "consideration of the totality of the circumstances that provide the context in which the [allegedly defamatory] statement occurs" is essential in order to "determine both its meaning and the extent to which making it actionable would burden freedom of speech or press." *Ollman v. Evans*, 750 F.2d 970, 997 (D.C. Cir. 1984) (Bork, J., concurring), *cert. denied*, 471 U.S. 1127 (1985).

## II.    PLAINTIFF'S DEFAMATION CLAIM MUST BE DISMISSED BECAUSE THE COLUMN IS NOT REASONABLY CAPABLE OF THE DEFAMATORY MEANING PLAINTIFF URGES

It is Plaintiff who gives "lip service" to the applicable standard that the "publication must be considered as a whole in the sense in which it would be understood by the readers to whom it was addressed," *Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001), but then invites the Court to "indulge far-fetched interpretations of the challenged publication." *Guilford*, 760 A.2d at 594. The Court "must be vigilant not to allow an implied defamatory meaning to be manufactured

from words not reasonably capable of sustaining such meaning." *White*, 909 F.2d at 519. " 'The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication *to have been intended* in the defamatory sense.' " *Id.* (quoting F. Harper & F. James, *The Law of Torts* § 5.4 (1986)) (emphasis in original); *accord Restatement (Second) of Torts* § 563 (1977) (meaning of challenged publication is that which audience would reasonably understand "was intended" by publisher).

Plaintiff effectively concedes that mere dating or sex between consenting single adults would not "make plaintiff appear 'odious, infamous, or ridiculous' " as required to constitute defamatory meaning. *Klayman*, 783 A.2d at 613. Consequently, plaintiff is forced to troll for accusations of serious professional or sexual misconduct where none exist. Plaintiff obsessively fixates for page after page on the two words "hooked up," arguing that the Column accused Plaintiff of having "engaged in sexual relations without emotional attachment" (Opp. at 6). Even Plaintiff, however, is forced to acknowledge that, "After thus 'romantically linking' each of these men with Ms. Benz, the Article went on to state: 'Now, she has hooked up, according to gal pals, with porn king, Mark Kulkis.' " (Opp. at 5).[2] The use of "hooked up" would clearly be

_____

[2] The entire item appears in the Column as follows:

### Controversial Love for CNN Producer

CNN Producer **Kathy Benz**, 35, uses her position to meet all the "right" people. She's been linked romantically with power players – including venture capitalist **Jonathan Ledecky** (a Washington Nationals ownership hopeful), University of Maryland basketball coach **Gary Williams**, Chicago Cubs VP **John McDonough**, Sirius CEO **Mel Karmazin**, actor **Hugh O'Brien**, CNN correspondent **John Bisney**, Georgetown hairstylist **Paul Bosserman** and her one-time fiancé [sic], AOL millionaire **John Daggett**. Now, she has hooked up, according to her gal pals, with porn king **Mark Kulkis**. The couple first met when Kulkis, 40, president and

understood as synonymous with the preceding verb "linked romantically" and Mr. Kulkis,

another man "now" on the list of those with whom plaintiff was "linked romantically." Sex,

casual or otherwise, is nowhere mentioned. Casual sex could not be reasonably understood

particularly since the man mentioned just before Mr. Kulkis was an AOL millionaire, with whom

the Column said Plaintiff had been affianced – hardly the kind of casual "sex without

commitment" Plaintiff ascribes. Indeed, even with regard to Mr. Kulkis, the title of the Column

describes a "Controversial Love" – again, reinforcing the notion of a romance or "love"

relationship, hardly the casual sex with no emotional component that Plaintiff strains to find.

While dating or even having "sex without emotional attachment" with a "porn king" might be

"controversial," it cannot be said to be "odious," particularly in this context where he is listed

along with other high achievers, where his very mainstream, establishment ties to the current

White House are what the Column emphasized, and where there was no suggestion that Plaintiff

herself was in any way involved in the porn business.

Plaintiff gives short shrift to the language of the Column in suit and instead focuses at

length on usages in books and surveys that have little or no bearing on the actual usage here.

Such reference to extraneous texts without regard to the actual use in the text in issue is not the

proper inquiry. *See Evans v. District of Columbia*, 391 F. Supp. 2d 160, 164 (D.D.C. 2005)

(when "addressing a motion to dismiss under Rule 12(b)(6), the Court generally may not look

outside the facts contained within the four corners of the complaint") (citing *Gordon v. Nat'l*

---

CEO of Kick Ass Pictures, did a CNN interview while he was in D.C. for
the National Republican Congressional Committee's annual President's
Dinner. He's the honorary chairman of the NRCC's Business Advisory
Council. That's a roundtable of millionaire entrepreneurs. Kulkis made
tabloid headlines when he escorted porn star **Mary Carey** to the GOP
dinner with **President Bush** in June. At that time, he and Carey enjoyed a
private lunch with White House insider **Karl Rove**. Wouldn't you have
liked to have been a fly on that wall?

*Youth Work Alliance*, 675 F.2d 356, 361 (D.C. Cir. 1982)).  The use here of "hooked up"

following a list of men of stature in the world of sports, entertainment, business and finance, with

whom Plaintiff, a 35-year old professional, had been "linked romantically," hardly suggests the

"sex without commitment" among college and high school kids cited by Plaintiff.  (Opp. at 10.)

The publication "must be considered as a whole in the sense and in which it would be understood

by the readers to whom it was addressed."  *Howard University v. Best*, 484 A.2d 958, 988 (D.C.

1984) (cited in Opp. at 10).  The language "should not be interpreted  by extremes, but should be

construed as the average or common mind would naturally understand them."  *Guilford*, 760

A.2d at 585, 594 (rejecting plaintiffs' claim that column "falsely portrays them as hostile and

antagonistic to labor" based on the column's "tone and choice of words").  The "common mind"

– particularly, the *Examiner* "readers to whom it was addressed" – could only reasonably

understand "hooked up" not in the college slang of casual sex but in the conventional sense: "to

become associated especially in a working or social relationship," Merriam-Webster's Collegiate

Dictionary, 11th ed. (2003) at 598, or "to get together with someone (as a date)."

Urbandictionary.com (Exhibit 3 to Opp.) (one of eight possible definitions).  Further, Plaintiff

can point to no "affirmative evidence" in the text that suggests the college slang meaning was

"intended" or "endorsed" by the 50-plus author writing in a newspaper of general circulation

(Amended Complaint ¶ 10), as required to show defamatory meaning.  *White*, 909 F.2d at 520

(must be "affirmative evidence [in the text] suggesting that defendant *intends* or *endorses* the

defamatory inference" for the communication to be "deemed capable of bearing that

[defamatory] meaning") (emphasis in original).

　　　　　Nor could reasonable readers construe the Column as making serious charges of

professional misconduct.  The "breezy" tone and the "imprecise, casual language" typical of a

gossip item such as this "differ[s] greatly from that of investigative report" examining allegations of serious professional or sexual misconduct. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (affirming grant of motion to dismiss defamation claim about a stock tip column); *see also Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (no reader could have understood the term "blackmail" – used by speaker at heated public meeting – to charge plaintiff with the commission of a crime, rather than as a vigorous epithet suggesting the unreasonableness of his position); *Jenkins v. Snyder*, 2001 WL 755818, at *5 (E.D. Va. 2001) (granting motion to dismiss for statement,  these guys are killing my players with their crappy fields,  because in order to allow the case to proceed,  the Court would have to overlook [the statements ] context and stretch the meaning of the words beyond a reasonable understanding ).

The *Examiner* is not arguing, as Plaintiff suggests, that  the fact the Article appeared in a gossip column insulate[s] it from attack  (Opp. at 14).  Rather, the fact that the item was in a gossip column informs how the reasonable reader would understand the language in suit. Language  must be judged with an eye towards readers  expectations and understandings. *Moldea v. New York Times Co.*, 22 F.3d 310, 315 (D.C. Cir. 1994) (context of a book review). Here, the  social conventions  of a gossip column, the breezy tone, the bold-faced names,  signal to the reader  that this is an item about the dating scene in D.C., not an investigative report about sexual or professional conduct.  *See Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) "([d]ifferent types of writing have  . . . widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion").

Plaintiff claims that the Correction further defamed her by suggesting that the Correction repeated that "Ms. Benz used her position at CNN to obtain romantic relationships" but Plaintiff again fails to mention the language that directly contradicts her claim.  (Opp. at 5.)  The

Correction explicitly states that the *Examiner* "did not intend to suggest any improper relationship or misuse of her position at CNN" – language which Plaintiff wholly ignores.[3] Amended Complaint at Exh. 17.  Again, reading the Correction as a whole, it is clear that the *Examiner* did not repeat any allegedly defamatory remark about Plaintiff, and, in fact, corrected, with apologies, what were determined to be inaccuracies in the Column.

Plaintiff fails to cite and discuss any decisions in which defamatory meaning was found and makes no attempt to distinguish – indeed, she does not even address – the numerous cases cited by the *Examiner* where the courts found the language not capable of a defamatory meaning, even though the literal meaning of the words could otherwise be defamatory or where the words were pejorative but not defamatory.  *See, e.g., Klayman v. Segal*, 783 A.2d 607 (D.C. 2001) (article's speculation about plaintiff that "If there were a school shooting, he'd say 'So what?' " could not be reasonably read to accuse plaintiff of insensitivity to the murder of children and accusation of being a publicity hound was not defamatory); *Weyrich*, 235 F.3d at 625 (holding that statement that plaintiff "suffered bouts of … paranoia" was "neither verifiable nor does it

---

[3] The Correction, published on September 30, 2005, stated:

> Karen Feld's August 19, 2005 "Buzz" column discussed several contacts made by Kathy Benz, an assignment editor at CNN.  The column said Ms. Benz had been linked romantically with nine men.  We now believe we were the target of an Internet "spoofer" who used an email address that appeared to come from another news organization.  Ms. Benz filed a lawsuit against The Washington Examiner regarding this column; while we ordinarily would not comment on pending litigation, we have learned that Mark Kulkis was interviewed by Ms. Benz but they never had a relationship of any kind.  In her complaint, Ms. Benz says she dated Gary Williams, Paul Bosserman and John Daggett, but did not date the other men mentioned in the column.  We regret the errors.  We did not intend to suggest any improper relationship or misuse of her position at CNN and apologize to Ms. Benz for any offense taken.

imply specific defamatory facts about plaintiff") (cited in the *Examiner*'s Memorandum of Law at 13-14, 16).

Nor does Plaintiff make any attempt to distinguish – indeed, she does not even address – the cases holding that speculation as to a Plaintiff's motives – here in contacting and dating the men mentioned in the Column – cannot be understood as a verifiable statement of fact (cited in the *Examiner*'s Memorandum of Law at 15-16). Instead, she argues about gal pals, checking and such (Opp. at 14) – none of which is relevant to the issue presently before the Court as to whether the text is reasonably capable of being understood as the defamatory statement of fact urged by Plaintiff; neither the Column nor the Correction is capable of such meaning.

## III. PLAINTIFF'S FALSE LIGHT INVASION OF PRIVACY CLAIM MUST ALSO BE DISMISSED BECAUSE THE COLUMN DOES NOT PLACE PLAINTIFF IN A HIGHLY OFFENSIVE FALSE LIGHT

In this case, the claim of false light invasion of privacy must be dismissed because the statements in the Column, even if false, would not be "highly offensive to a reasonable person." *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 40 (D.D.C. 2002) (citing *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999)), *aff'd*, 350 F.3d 1272 (2003), *cert. denied*, 541 U.S. 1042 (2004). For the same reasons they are not capable of a defamatory meaning, statements that Plaintiff was "romantically linked" with several men, including "hooked up" with Mr. Kulkis, and that she met the men through her job, are no more "highly offensive" than they are "odious, infamous, or ridiculous."

## IV. PLAINTIFF'S PUBLIC DISCLOSURE OF PRIVATE FACTS CLAIM ALSO FAILS TO STATE A CLAIM

Plaintiff does not seriously contest the *Examiner*'s argument that the claim of public disclosure of private facts must be dismissed, stating cursorily that "Ms. Benz has established all elements of this claim." Opp. at 16. Plaintiff does not specifically address any of the

*Examiner*'s arguments, namely: (1) with regard to the facts which Plaintiff maintains are false, Plaintiff cannot bring a private facts invasion of privacy claim since disclosure of <u>true</u> private facts is a prerequisite for the claim;  (2) the statements in the Column which Plaintiff says are true – namely, that Plaintiff was "linked romantically" with Gary Williams, Paul Bosserman, and John Daggitt – are not "highly offensive to a reasonable person of ordinary sensibilities;" (3) the facts here – dating three single men, one a fiancée – are not of the "intimate" nature the claim is meant to address; and (4) the allegedly "private facts" – that Plaintiff had dated three men – were not private by the time the *Examiner* reported them, since as Plaintiff alleges in the Amended Complaint, they had been widely circulated on the Internet.  Because the true facts in the Column (that Plaintiff dated Gary Williams, Paul Bosserman, and John Daggitt) are neither private, intimate, nor highly offensive; and because Plaintiff can not bring a private facts claim for the remaining content in the Column which she claims is false, the claim for publication of private facts must be dismissed for failure to state a claim upon which relief may be granted.

## CONCLUSION

For the foregoing reasons, and the reasons stated in its Motion to Dismiss, Defendant respectfully requests that the court grant its motion to dismiss for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6), and dismiss the Complaint with prejudice against Defendant The Washington Newspaper Publishing Company, LLC.


Dated this 30th day of December, 2005.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: _____/S/_____
    Laura R. Handman (D.C. Bar No. 444386)
    Amber L. Husbands (D.C. Bar No. 481565)
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W., Suite 450
Washington, D.C. 20005-1272
(202) 508-6600
(202) 508 6699 fax

Attorneys for Defendant The Washington
Newspaper Publishing Company, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 30, 2005, I caused the foregoing to be served

electronically on counsel of record by the U.S. District Court for the District of Columbia

Electronic Document Filing System (ECF).


_____/S/_____
Amber L. Husbands
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W., Suite 450
Washington, D.C.  20005-1272
(202) 508-6600