**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
KATHLEEN A. BENZ,              )
                               )
                Plaintiff,     )
                               )
        v.                     )  Civil Action No. 05-1760 (EGS)
                               )
THE WASHINGTON NEWSPAPER       )
PUBLISHING COMPANY, LLC and    )
JOHN F. BISNEY,                )
                               )
                Defendants.    )
_____)
```

**<u>MEMORANDUM OPINION</u>**

Plaintiff Kathleen Benz commenced this action against defendants, The Washington Newspaper Publishing Company, LLC, publisher of the Washington Examiner ("the Examiner") and John F. Bisney ("Bisney"), alleging defamation, invasion of privacy, and intentional infliction of emotional distress, related to a gossip column published in the August 19, 2005 issue of the Examiner and for articles with similar content posted on various websites. Pending before the Court are defendants' respective motions to dismiss.  Upon consideration of the motions, the responses and replies thereto, the Examiner's motion is **DENIED IN PART** and **GRANTED IN PART**, and Bisney's motion is **DENIED IN PART** and **GRANTED IN PART**.

**I.    FACTUAL BACKGROUND**

Plaintiff is an assignment editor at the Washington, D.C.

1

office of the Cable News Network ("CNN"). Am. Compl. ¶ 6.
Defendant Bisney is a former CNN radio correspondent and a former
colleague of plaintiff. *Id*. ¶ 11.  In November 2002, plaintiff
and Bisney developed a social friendship. *Id*. ¶ 16.
During the period of their friendship, Bisney repeatedly
expressed his desire to have a romantic and sexual relationship
with plaintiff.  Plaintiff, however, insisted on and maintained a
platonic relationship with him. *Id*. ¶¶ 21-22, 56-57.

Their friendship ended in May 2005 when plaintiff learned
that Bisney, without plaintiff's knowledge or permission,
obtained access to her email account, read her emails, and
established and maintained websites in the name of the plaintiff.
*Id* ¶¶ 17, 69, 84-86.  On those websites, Bisney posted personal
and private information and photographs of plaintiff. *Id.*  Bisney
also wrote a "fake" article[1] about the plaintiff and sent it to
her.[2] *Id*. ¶¶ 64-65.  The article named various men whom plaintiff

---

[1] Plaintiff does not allege in her Amended Complaint that
this "fake" article was published on any website or publication.

[2] The article states:

CNN DC Bureau producer Kathy Benz has made something
out of a career out of dating wealthy, prominent local power
players, from Maryland hoops coach Gary Williams to venture
capitalist Mark Ein. But a recent paramour apparently
doesn't have such deep pockets. In a dust-up that has their
bureau buzzing, CNN's Hill radio reporter John Bisney is
ready to sue, hoping to recover $14,000 he claims to have
loaned Benz over the past year.  With things now on the
skids, Bisney, also the long-time announcer for *Crossfire*,
wants his money back. "She told me she needed tuition for a

has allegedly dated. *Id*. ¶ 65.  Of all the men mentioned, plaintiff has actually only dated Gary Williams, Paul Bosserman, Julian Epstein, and John Daggitt. *Id*. ¶ 66.

On June 1, 2005, plaintiff filed for a temporary restraining order against Bisney in the District of Columbia Superior Court. *Id*. ¶¶ 103-04.  On July 11, 2005, plaintiff and Bisney entered into a "Binding Settlement Agreement and Release," which provided that "[t]he parties agree that they will not intentionally contact or communicate with each other." *Id.* ¶¶ 106, 107.

In July 2005, more articles about plaintiff, authored by Bisney, appeared on the internet.[3] *Id*. ¶¶ 109, 112, 117, 120.  In

Georgetown MBA, but it went for her personal expenses," said Bisney, 50. "Kathy's used to guys shrugging it off, but to me that's real money." Benz, 34, has been spotted around town in the company of Democratic superlawyer Julian Epstein, Rep. Pete Sessions (R-Tex.), Georgetown hairdresser to the stars Paul Bosserman and Bush I chief of staff John Sununu. She was also engaged to multimillionaire John Daggit, who made his fortune during AOL's heyday.

[3] One version of the articles on the internet states:

X-rated video mogul Mark Kulkis, who escorted porn star Mary Carey to last month's GOP dinner with President Bush, has found a new love interest: Washington power dater and CNN producer Kathy Benz.
The two only met a month ago during an interview while Kulkis, 40, president and CEO of Kick Ass Pictures, was in DC for the National Republican Congressional Committee's annual President's Dinner.  He's honorary chairman of the NRCC's business Advisory Council, a roundtable of millionaire entrepreneurs.
Benz denies cozying up to Kulkis to get a scoop for CNN about the private lunch he and Carey had with White House Chief of Staff Karl Rove.  "Mark's a wonderful guy and I think this could be the real thing," she tells

August 2005, Bisney used plaintiff's name, her home and work telephone numbers, her home address, and email address to respond to personal advertisements seeking sexual relations on a website. *Id*. ¶ 142. As a result, plaintiff received numerous phone calls and email messages from individuals who believed that plaintiff wanted to engage in sexual relations with them. *Id*. ¶ 143.

On August 19, 2005, the Examiner published an article in the gossip column entitled "Controversial Love for CNN Producer"[4] by

---

girlfriends.
    Benz 35, is known in Washington power circles for dating such figures as venture capitalist Jonathan Ledecky (now trying to buy the Washington Nationals), Univ. of Maryland basketball coach Gary Williams, and spent time last August with Sirius CEO Mel Karmazin at his Hamptons home.

A second variation of the article has this final sentence: "Her regular companions include Rep. Pete Sessions (R-Tex.), John Sununu, Sr., venture capitalist Mark Ein, John McDonough, and Democratic lawyer Julian Epstein. She was engaged to John Daggitt, AOL millionaire."

A third variation begins with "Cute catch of the day and Kickass Pictures CEO, Mark Kulkis (40), has started dating a little further up the food chain. Recent reports have linked him to CNN producer Kathy Benz (35)." After listing all the men plaintiff has allegedly dated, the articles concludes with this final sentence, "Finally a relationship in which Kulkis isn't the sluttier one. Happy herpes!"

[4] The Examiner article states:

    CNN Producer Kathy Benz, 35, uses her position to meet all the "right" people. She's been linked romantically with power players - including venture capitalist Jonathan Ledecky (a Washington Nationals ownership hopeful), University of Maryland basketball coach Gary Williams, Chicago Cubs VP John McDonough, Sirius CEO Mel Karmazin, actor Hugh O'Brien, CNN correspondent John Bisney, Georgetown hairstylist Paul Bosserman and her one time

Karen Feld. *Id*. ¶ 162.  Prior to publishing this article, Ms.

Feld did not speak to the plaintiff. *Id*. ¶ 166.  Once the article

was published, plaintiff contacted Ms. Feld and told her that the

article was substantially false. *Id*. ¶ 176.  On September 30,

2006, the Examiner published an article by Karen Feld entitled

"Correction."[5] *Id*. ¶ 180.  On September 2, 2005, plaintiff filed

this civil action against defendants the Examiner and Bisney

alleging defamation, invasion of privacy and intentional

---

fiancé, AOL millionaire John Daggitt.  Now she has hooked
up, according to her gal pals, with porn king Mark Kulkis.
The couple first met when Kulkis, 40, president and CEO of
Kick Ass Pictures, did a CNN interview while he was in D.C.
for the National Republican Congressional Committee's annual
President's Dinner.  He's the honorary chairman of the
NRCC's Business Advisory Council.  That's a roundtable of
millionaire entrepreneurs. Kulkis made tabloid headlines
when he escorted porn star Mary Carey to GOP dinner with
President Bush in June.  At that time, he and Carey enjoyed
a private lunch with White House insider Karl Rove. Wouldn't
you have liked to have been a fly on that wall?

[5] The Examiner's "Correction" states:

Karen Feld's August 9, 2005, "Buzz" Column discussed several
contacts made by Kathy Benz, an assignment editor at CNN.
The column said Ms. Benz had been linked romantically with
nine men. We now believe we were the target of an Internet
"spoofer" who used an email address that appeared to come
from another news organization. Ms. Benz has filed a lawsuit
against the Washington Examiner regarding this column; while
we ordinarily would not comment on pending litigation, we
have learned that Mark Kulkis was interviewed by Ms. Benz
but they never had a relationship of any kind.  In her
complaint, Ms. Benz says that she dated Gary Williams, Paul
Bosserman and John Daggitt, but did not date the other men
mentioned in the column. We regret the errors. We did not
intend to suggest any improper relationship or misuse of her
position at CNN and apologize to Ms. Benz for any offense
taken.

infliction of emotional distress[6].

## II.  STANDARD OF REVIEW

The Court will not grant a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). *See also Swierkiewicz v. Sorema,* 534 U.S. 506, 514 (2002) (stating that a court may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations").  Accordingly, at this stage of the proceedings, the Court accepts as true all of the complaint's factual allegations.  *See Does v. United States Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985). Plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." *Kowal*, 16 F.3d at 1276.

## III. DEFAMATION

Plaintiff contends that defendant, the Examiner, committed defamation when it published an article about the plaintiff in the August 19, 2005 gossip column.  Plaintiff also alleges that defendant Bisney committed defamation when he posted "fake"

---

[6] This claim is only asserted against defendant Bisney. *See* Am. Compl. ¶¶ 232-45.

articles he wrote about the plaintiff on various websites (hereinafter referred to as "the internet articles"). The August 19, 2005 article in the Examiner is similar in content to Bisney's internet articles.[7]

According to the plaintiff, these articles are defamatory because they allege that plaintiff uses her position at CNN to meet and become romantically and sexually involved with "power players," i.e. wealthy, influential men; that she "hooked up" with porn king Mark Kulkis; and that hooking up with Kulkis was part of her pattern of using her position in the media to meet prominent men for personal and professional gain. These articles, which plaintiff alleges are false[8], have harmed her reputation professionally and in her community. *See Howard Univ. v. Best*, 484 A.2d. 958, 988 (D.C. 1984).

In response, the Examiner argues that there is nothing defamatory about a single woman being "linked romantically" with single men. Since none of the men mentioned in the column are married, there is no implication of sexual misconduct or

---

[7] When compared to the Examiner's August 19, 2005 article, Bisney's internet articles name additional "rich and powerful" men who are plaintiff's "regular companions," describes in detail plaintiff's love interest and relationship with "X-rated video mogul" Mark Kulkis, and alludes to a sexually transmitted disease, herpes.

[8] False but for the statements that she dated Paul Bosserman, Gary Williams, John Daggitt, and Julian Epstein are true. Am. Compl. ¶ 66.

impropriety.  Moreover, the Examiner argues, the phrase "hooked up" is not capable of defamatory meaning because it just means that Mark Kulkis and plaintiff met on a social basis.  Finally, the plain meaning of the statement that plaintiff "uses her position" to meet the "right people" is that plaintiff is a CNN producer, who, by definition, must use her position to meet the right people, i.e. those in a position to supply her with information for interviews and news stories.  To the extent that the Examiner article is similar to the internet articles, Bisney adopts the Examiner's arguments as to why the internet articles are not defamatory.

## A.    Legal Framework

A publication is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Howard Univ.,* 484 A.2d. at 988. "Whether a statement is capable of defamatory meaning is a question of law." *Weyrich v. The New Republic*, 235 F.3d 617, 627 (D.C. Cir. 2001).  If a statement is reasonably capable of any defamatory meaning then the Court cannot rule, as a matter of law, that it was not libelous. *Id.*  A statement found to be defamatory "must be more than unpleasant or offensive." *Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001).  It must be "odious,

infamous or ridiculous."[9] *Id.*

The Court must consider the document as a whole, and must examine the alleged defamatory statements within context. *Id.* at 614 ("[c]ontext serves as a constant reminder that a statement in an article may not be isolated and then pronounced defamatory..."). Further, words should be given their plain and natural meaning, and "the statements at issue should not be interpreted by extremes, but should be construed as the average or common mind would naturally understand them." *Id.* at 616. The plaintiff has the burden of proving the defamatory nature of the challenged statement. *Id.* at 613. Finally, when the Court is presented with a Rule 12(b)(6) motion to dismiss a defamation action, the Court must assume the falsity of the statements at issue and that the statements were made by the defendants with knowledge of their falsity or reckless disregard for their truth. *Id.* at 614.

**B.    The Examiner's August 19, 2005 Article is Capable of Defamatory Meaning.**

The article in the Examiner opens with a statement that plaintiff "uses her position to meet all the 'right' people."

---

[9] Odious has been defined to mean "arousing or deserving hatred or loathing"; infamous as "notorious or in disgrace or dishonor"; and ridiculous as "deserving ridicule," which is the act of making someone or something the object of scornful laughter by joking and mocking. *Klayman,* 783 A.2d at 619.

The next sentence declares that "[s]he's been linked romantically with power players" and then lists the names of eight men with whom plaintiff has had romantic liaisons.  Next, the article turns to plaintiff's most recent relationship and states that she "has hooked up" with "porn king Mark Kulkis."

When statements such as "uses her position to meet the 'right' people"; "linked romantically with power players"; and "hooked up" with a "porn king" are considered within the context of the article as a whole and the words are given their ordinary meaning, the Court finds that an average, ordinary reader could likely comprehend that plaintiff uses her position at CNN for personal gain.  Plaintiff is a single, professional woman in her mid-30s.  An allegation that she is using her position in the media to meet and engage in romantic and sexual relations with certain prestigious and powerful men, in order to advance her career and social status, arguably makes the plaintiff appear "odious, infamous and ridiculous."  The Court is further persuaded that the article's characterization of the plaintiff and her alleged pattern of practice tend to injure plaintiff's reputation in her profession and her overall standing in her community. See *Howard Univ.*, 484 A.2d. at 988.  Therefore, the article is reasonably capable of defamatory meaning.

The Examiner argues that the phrase "linked romantically" merely means that the plaintiff has been rumored to have had

romantic relationships or love affairs with the men mentioned, and that there is nothing defamatory about dating or even sex between two consenting adults in this day and age in a major metropolitan area.  The Court disagrees.  The phrase "linked romantically" cannot be read in isolation from the laundry list of prominent men with whom plaintiff has allegedly been involved, the description of plaintiff using her position to meet these right men, nor the statement that she hooked up with a porn king. When all of these statements are examined together within context, the article paints a picture of an opportunistic woman who will use her job in the media and sex to get what she wants. Such an image conveys a lack of certain moral and ethical restraint on the part of the plaintiff.

The same applies to the phrase "hooked up...with porn king Mark Kulkis."  The Examiner argues that phrase is not defamatory because it merely means that plaintiff and Mark Kulkis met on a social basis.[10]  However, when that phrase is read in context, the Court is persuaded that it does not merely mean that plaintiff and Mark Kulkis met on a social basis.  Rather, it implies that plaintiff engaged in some conduct relating to sex with "porn king Mark Kulkis" as part of her pattern of using her

---

[10] In contemporary slang, "hooking up" can mean everything from a kiss to sexual intercourse. *See* http://www.urbandictionary.com.  Both plaintiff and the Examiner recognize such meaning to the phrase "hooking up." *See* the Examiner's Mot. to Dismiss at 10, fn. 6; Pl's Opp. at 11.

CNN position to meet such men.

Further, the Court is not persuaded by the Examiner's argument that the plain meaning of the statement that plaintiff "uses her position" to meet the "right people" is that plaintiff is a CNN producer who, by definition, must "use her position" as a journalist to meet the "right" people, i.e. those in a position to supply her with information for interviews. The understanding the Examiner attributes to the phrase in question can only be achieved if the phrase is read in isolation. When it is examined in context with the article in its entirety, the Court finds that the meaning of that phrase is not so innocuous. Rather, the meaning that readily comes to the surface is that plaintiff is using her position as a CNN producer, not to further any journalistic endeavors, but to meet and become romantically involved with  wealthy, influential men.[11]

The Examiner also contends that only "serious sexual misconduct" may give rise to defamatory meaning. The Restatement (Second) of Torts ("Restatement") § 574 (1977), however, states that "any statements that impute[] any form of unchastity to a woman, married or single" have been defined as "serious sexual

---

[11] Alternatively, the Examiner argues that the phrase could be interpreted to mean that plaintiff has met men through her position at CNN whom she later has seen on a social basis, and such statement is hardly damaging to her reputation. Again, as observed by the Court herein, when the phrase is read and examined in context, it is capable of defamatory meaning.

misconduct." Because the article alleges plaintiff of unchaste conduct, it, by definition, has also alleged plaintiff of "serious sexual misconduct." *See* Restatement § 574. The Examiner's argument is therefore, unavailing, and the plaintiff has shown at this juncture that the article in the Examiner is capable of defamatory meaning.

Finally, the Examiner argues that the fact that the article appeared in a gossip column should inform the Court as to how a reasonable reader would understand the article. The Examiner maintains that a reader would not take seriously the allegations made in a gossip column, with its "breezy" tone and casual language, as an allegation made in a more serious investigative report. Because the article appeared in a gossip column, argues the Examiner, it is less likely that a reader would understand it to be an allegation of unprofessional conduct.

The Court agrees that the tone of a gossip column could certainly be different from a serious investigative report; however, the August 19, 2005 article focused on the plaintiff and implied certain conduct on the part of the plaintiff that made plaintiff appear "odious, infamous and ridiculous." *See Weyrich,*, 235 F.3d at 627. Therefore, even though the article appeared in the gossip column, the Court finds that it is capable of

defamatory meaning.[12]

**C.    The "Correction" Published in the Examiner on September 30, 2005 is Not Reasonably Capable of Defamatory Meaning.**

Plaintiff alleges that the "Correction" published in the Examiner on September 30, 2005, again stated defamatory allegations, namely that she used her position at CNN to obtain romantic relationships.  The Court disagrees.

When the "Correction" is read as a whole, it is clear that the Examiner did not make any statements that are capable of defamatory meaning.  In fact, the Examiner corrected, with apologies, any statements in the August 19, 2005 article that were determined to be false.  Specifically, the "Correction" states that the Examiner "did not intend to suggest any improper relationship or misuse of her position at CNN."  Because a reasonable person of ordinary intelligence would understand the "Correction" as just that, a correction to the inaccuracies contained in the August 19, 2006 article, the Court concludes that the September 30, 2005 "Correction" is not reasonably capable of defamatory meaning as a matter of law.  It does not

_____

[12] The Examiner also argues that the article's statement that plaintiff "uses her position to meet all the 'right' people" is not a statement of fact, rather it is a statement of opinion, therefore it is incapable of defamatory meaning.  This argument lacks merit.  The Court cannot discern what opinion is being proffered by the statement in question.  Rather, the statement clearly imputes a fact that plaintiff is using her position to meet all the right people.

14

make plaintiff appear "odious, infamous or ridiculous."

Before finding that the statements in the "Correction" are not actionable, the Court must also examine whether the statement places plaintiff in a "highly offensive" false light. *See Weyrich*, 235 F.3d at 628 ("We remind the District Court that, before finding that a statement is not actionable, because it is not reasonably capable of defamatory meaning, it must also satisfy itself that the statement does not arguable place appellant in a 'highly offensive' false light."). The "Correction" regrets any errors made in the August 19, 2005 article that may have placed plaintiff in a false light and apologizes for any offense taken. As such, the Court concludes that there is nothing in the "Correction" that would place plaintiff in a highly offensive false light.

### D.  Defendant Bisney's Internet Articles are Reasonably Capable of Defamatory Meaning.

There are many similarities between the August 19, 2005 article in the Examiner and Bisney's internet articles.[13]  Not only do the defendants' articles relay the same information as to plaintiff's alleged romantic relationships, but the tone and the context in which the information is presented are similar as well.  Having already determined that the August 19, 2005 article in the Examiner is reasonably capable of defamatory meaning, the

---

[13] Compare footnotes 1-3.

15

Court finds Bisney's internet articles, when considered as a whole and in context, are also reasonably capable of defamatory meaning.

## IV.   INVASION OF PRIVACY[14]

### A.   Plaintiff Has Stated a Claim for False Light Against Defendants the Examiner and Bisney.

Plaintiff has alleged that both defendants the Examiner and Bisney have violated her privacy by placing plaintiff in a false light.  The Examiner argues that plaintiff's false light claim should be dismissed because the statements in the article, even if false, would not be "highly offensive to a reasonable person." *See Weyrich,* 235 F.3d at 628.  Defendant Bisney incorporates his arguments against the defamation claim to the false light claim.

A false light invasion of privacy claim requires a showing of (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff and (4) which places the plaintiff in a false light that would be highly offensive to a reasonable person. *Klayman*, 783 A.2d at 614.  "Whereas an action for defamation redresses damage to one's reputation, the tort of false light is intended to remedy mental

_____

[14] The tort of invasion of privacy protects against four distinct types of invasions: false light; intrusion upon one's solitude or seclusion; public disclosure of private facts; and appropriating one's name or likeness for another's benefit.  *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989).  In her amended complaint, plaintiff alleges intrusion upon seclusion (Count II), public disclosure of private facts (Count III), and false light (Count IV). *See* Am. Compl. ¶¶ 191-231.

16

distress from having been exposed to public view." *Lane v. Random House, Inc.,* 985 F. Supp. 141, 149 (D.D.C. 1995).  However, "[t]here is a great deal of overlap between the causes of action for defamation and false light." *Moldea v. New York Times Co.* 15 F.3d 1137, 1151 (D.C. Cir. 1994).  "Publicity that is actionable in a false light claim generally will be actionable in defamation as well." *Id.*  Because the torts of defamation and invasion of privacy false light are so similar, a plaintiff may only recover on one of the two theories based on a single publication, but is free to plead them in the alternative. *Weyrich,* 235 F.3d at 628.

The Court's reasons as to why the Examiner's August 19, 2006 article and Bisney's internet articles are capable of defamatory meaning are applicable to the Court's finding that those articles would be highly offensive to a reasonable person.  Those articles, which implied that plaintiff, a professional, single woman in her 30s, used her job in the media to obtain romantic and sexual relationships with "power players" for personal gain, and that linked her in a sexual relationship with a "porn king," would be highly offensive to a reasonable person.  Accordingly, plaintiff has pleaded sufficient facts to make out a claim for false light invasion of privacy against both of the defendants.

**B.    Plaintiff has Stated a Claim for Public Disclosure of Private Facts against Defendants the Examiner and Bisney.**

The Examiner argues that invasion of privacy by public

17

disclosure of private facts claim should be dismissed because the *sine qua non* of this claim is that the facts made public are intimate, private and true.  Since plaintiff has alleged in her complaint that most of the statements in the August 19, 2005 article are false, by plaintiff's own admission, this claim must be dismissed.  Further, for the statements in the column that are true--the identities of the men plaintiff actually dated--those statements are not "highly offensive to a reasonable person of ordinary sensibilities." *Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989).

Defendant Bisney adopts the Examiner's arguments and adds that with regard to plaintiff's home and work numbers and her home and email addresses posted on a website seeking sexual relations, those true facts hardly amount to such facts that would be highly offensive to a reasonable person.  Further, Bisney argues, because plaintiff's phone numbers and addresses were already available on the internet, those facts are not private facts, and thus he cannot be held liable for disclosing information already known to the public.[15]

---

[15] For the first time in her opposition to defendant Bisney's motion to dismiss, plaintiff alleges that she suffers from a form of herpes, *see* Pl.'s Opp. at 21, and argues that disclosure of this fact by Bisney satisfies the elements of her disclosure of private facts claim.  This fact about the plaintiff is not presented anywhere in her complaint or amended complaint.  In one of defendant Bisney's internet articles, a reference to herpes is made in relation to plaintiff's and Mark Kulkis' alleged romantic relationship. The Court observes that public disclosure of such a

To recover for public disclosure of private facts, a plaintiff must show (1) the publication of private facts (2) in which the public has no legitimate concern (3) whose publication would cause suffering, shame or humiliation to a person of ordinary sensibilities. *White v. Fraternal Order of Police*, 707 F. Supp. 579, 587 (D.D.C. 1989). This privacy tort seeks to "redress reputational injuries made all the more painful because the public revelations about deeply private and intimate matters are undeniably true." *Doe v. United States,* 83 F. Supp. 2d 833, 842 (S.D. TX 2000).

The Examiner is correct that the *sine qua non* of this claim is that the information revealed to the public is not only intimate and private but also true. Plaintiff has alleged that much of what the article has stated about her is untrue: she does not use her position to meet the "right" people; she has not been romantically involved with Jonathan Ledecky, John McDonough, Mel Karmazin, or Hugh O'Brien, and she has not been involved romantically or otherwise with Mark Kulkis. Since those statements in the column are false, the Court concludes that plaintiff cannot bring a claim for public disclosure of private facts for those statements.

The plaintiff, however, has stated that statements about her

condition, which is a private fact, would be highly offensive to a reasonable person.

romantic relationships with Gary Williams, Paul Bosserman, John Daggit, and Julian Epstein are true.  As such, if the public has no legitimate concern in these matters and if the publication of these facts "would cause suffering, shame or humiliation to a person of ordinary sensibilities," then a claim for public disclosure of private facts has been sufficiently pleaded at this time.  The Court is persuaded that it is unlikely that an unmarried, professional woman in her 30s would want her private life about whom she had dated and had sexual relations revealed in the gossip column of a widely distributed newspaper, particularly in the context in which the information was revealed.  Further, plaintiff's personal, romantic life is not a matter of public concern.  Because the Court finds that unwanted publication of such personal, true facts would cause suffering, shame or humiliation to a person of ordinary sensibilities, the plaintiff has sufficiently satisfied the elements of this claim.[16]

Turning to Bisney's argument, the Court must address whether public disclosure of plaintiff's phone numbers and addresses on an internet site soliciting for sexual relations would "cause suffering, shame or humiliation to a person of ordinary

---

[16] The same reasoning is applicable to Bisney's argument that disclosure of the names of the actual men plaintiff dated is not "highly offensive to a reasonable person of ordinary sensibilities."

sensibilities." Although plaintiff's phone numbers and addresses may be available to the public on the internet and in phone books, that does not negate the fact that the information are nonetheless private facts. Individuals have a privacy interest in their home addresses and phone numbers. *See National Ass. of Retired Fed. Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) (privacy interests of individuals in avoiding the unlimited disclosure of names and addresses is significant, therefore individuals not only have a large measure of control over the disclosure of their own identities and whereabouts, but people expect to be able to exercise that control); *Heights Community Congress v. Veterans Administration*, 732 F.2d 526, 529 (6th Cir. 1984) ("The importance of the right to privacy in one's address is evidenced by the acceptance within society of unlisted telephone numbers...and postal boxes, which permit the receipt of mail without disclosing the location of one's residence."). Plaintiff's phone numbers and home address are private facts

In this case, plaintiff's private facts were not published in a website listing CNN producers or in a media bulletin or in any such site. Rather, plaintiff's private facts were used for solicitation purposes. Plaintiff's personal information was provided to individuals seeking to have sex with plaintiff under the information and belief that plaintiff wanted to have sex with them. Such disclosure of one's private facts would be "highly

21

offensive to a reasonable person of ordinary sensibilities."
Therefore, the Court concludes that the plaintiff has stated a
claim for public disclosure of private facts against defendant
Bisney.[17]

### C. Plaintiff has Failed to State a Claim for Intrusion Upon Seclusion Against Defendant Bisney.

Intrusion upon seclusion has three elements: (1) an invasion

---

[17] Bisney cites to *Wolf v. Regardie*, 553 A.2d 1213 (D.C.
1989) to argue that once information is available to the public
from public sources, disclosure of that information cannot be
considered to be a disclosure of private facts.  The facts of
*Wolf*, however, are distinguishable.  In *Wolf*, a media defendant
published an article listing plaintiff as one of Washington's
wealthiest individuals.  The information about plaintiff's assets
and net worth was gathered through public records such as court
documents.  The *Wolf* Court concluded that plaintiff failed to
establish that the facts published were private facts.  The Court
based its holding on First Amendment principles and the right of
the press to publish "truthful information already extent on the
public record" because that is "of critical importance to our
type of government in which the citizenry is the final judge of
the proper conduct of public business." *Wolf*, 553 A.2d at 1221.
In sum, the Court stated that it was "reluctant to embark on a
course that would make public records generally available to the
media but forbid their publication if offensive to the
sensibilities of the supposed reasonable man." *Id*.  *See also
Dresbach v. Doubleday & Co.*, 518 F. Supp. 1285, 1288 (D.D.C.
1981)(in an invasion of privacy for public disclosure of private
facts case, the court notes how protection of First Amendment
values have persuaded courts to give broad latitude to those
publications, which may possibly reveal private information
offensive to the ordinary person, but are of public or general
interest).

The situation in this case is markedly different. There are
no freedom of the press concerns here, nor was Bisney disclosing
facts of public interest and concern.  Rather, he disclosed
plaintiff's private information to a discrete audience, and a
reasonable person of ordinary sensibilities would be highly
offended if their personal information was disclosed without
consent to such an audience.

or interference by physical intrusion by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination (2) into a place where the plaintiff has secluded herself or into her private or secret concerns (3) that would be highly offensive to an ordinary, reasonable person. *Wolf,* 553 A.2d at 1217.  "It is the nature of the intrusion which initially fixes liability." *Id.*  The types of invasion this tort seeks to address are harassment, peeping through windows or into other locations, opening personal mail, eavesdropping on private conversations, entering plaintiff's home without permission, searching plaintiff's belongings, examining plaintiff's private bank account or other invasions of that nature. *Id.* at 1217-18.

In Count II of her complaint, plaintiff alleges that defendant Bisney invaded her privacy by intruding upon her seclusion.  But plaintiff does not specify how Bisney invaded or interfered with her seclusion by physical intrusion. Plaintiff, however, does allege in her opposition to Bisney's motion that she suffers from a form of herpes, *see* Pl.'s Opp., p. 21, and that disclosure of this fact by Bisney satisfies the elements of intrusion of seclusion.

Because plaintiff fails to explain whether Bisney learned of this fact by physical intrusion into a place where she secluded herself, the Court is not persuaded that the elements of this claim have been met.  Plaintiff does not allege that Bisney

23

learned this fact by eavesdropping on her private conversations or looking through her personal papers.   Rather she states that her condition is a private fact that is known to only a few of her close friends, such as Bisney.[18]   Therefore, if plaintiff told Bisney about her condition, then she cannot claim that he intruded into a place where she secluded herself.   Accordingly, at this juncture this claim is dismissed without prejudice.[19]

## V.    CONCLUSION

For the foregoing reasons, the Court finds that as a matter of law, the Examiner's August 19, 2005 article and Bisney's various internet articles are reasonably capable of defamatory meaning.   However, the Examiner's September 30, 2006 "Correction" is not an actionable defamatory statement.   Also, plaintiff has sufficiently pleaded invasion of privacy claims of false light and public disclosure of private facts against both defendants.

---

[18] The actual sentence reads, "Ms. Benz suffers from a form of herpes, a private fact unknown to only a few of her close friends, such as Bisney."   Pl.'s Opp. at 21. The Court notes that the sentence is unclear due to a misuse of a word.   Bisney in his reply has interpreted this sentence to mean that Bisney knew of plaintiff's condition, which was disclosed to him by plaintiff because he was one of her close friends. *See* Bisney's Reply at 7. Plaintiff has not made any representations that such a reading of that sentence is incorrect. Therefore, because Bisney's reading of that sentence is the most reasonable interpretation given the context, the Court adopts that interpretation.

[19]   In view of the apparent ambiguity over how Bisney may have learned of plaintiff's condition, the plaintiff shall have ten  days from the date of this Order to file a pleading seeking any appropriate relief.

Plaintiff, however, has failed to state a claim for invasion of her privacy by intrusion upon her seclusion against defendant Bisney.  Accordingly, that claim is dismissed at this time without prejudice.  An appropriate Order accompanies this Memorandum Opinion.


**Signed:**   **Emmet G. Sullivan**
        **United States District Judge**
        **September 29, 2006**